Robert HUNTLEY, Plaintiff-Appellant,

v.

DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, Joseph A. Califano, Jr., Secretary, et al., Defendants-Appellees.

No. 76–1810.

United States Court of Appeals, Fifth Circuit.

April 8, 1977.

Bernette J. Johnson, Anthony W. Skidmore, Okla Jones, II, New Orleans, La., for plaintiff-appellant.

Gerald J. Gallinghouse, U. S. Atty., Leonard P. Avery, Asst. U. S. Atty., New Orleans, La., for defendants-appellees.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal by Robert Huntley, a black employee of the Department of Health, Education and Welfare, from a summary judgment entered by the trial court denying him his petition for back pay allegedly due him because of a finding by the Secretary that the denial of his promotion by his supervisors was racially motivated.

Without objection, the parties presented the issue to the trial court on the administrative record, not seeking a trial de novo. The Government does not contest the standard of review of the administrative action announced by the trial court:

"A federal employee complaining of ineffective administrative relief for discrimination in his employment is entitled to have the court conduct an independent review of the administrative record submitted by the Department, and the court must make its own decision based upon all relevant evidence." Citing Robinson v. Warner, 8 E.P.D. ¶ 9452 (D.D.C.1974);

*Day v. Weinberger*, 8 E.P.D. ¶ 9771 (D.D. C.1974).[1]

■ Because the district court did not itself hear testimony, the weight which this Court must accord to its findings of fact under the "clearly erroneous" rule is somewhat diminished. *See Smith v. United States*, 502 F.2d 512 (5th Cir. 1974). Without objection from the government, the lower court adopted the decision of HEW that Huntley had been discriminated against. The court concluded, however, that it was not clear from the record that Huntley would have been promoted but for the discrimination. Assuming, as we do for the purpose of this discussion that Huntley had the burden of proving that "but for" the illegal selection of Bitterwolf, the white candidate, he clearly would have been chosen for the job, we conclude that Huntley met this burden and we therefore reverse the judgment of the trial court dismissing the complaint.

Briefly stated, the facts are that in December, 1969, Huntley applied for the position of warehouse foreman which had become vacant. Alvin Bitterwolf, a white male, also applied for the same position. Three others applied for it, including Wellmond Arcenaux, Jr., a black, and two other white men.

On the rating sheet which the appointing authority stated she relied upon in making the appointment of Bitterwolf, the white man, he made a composite score of 90. This was compiled by a basic rating, which was given uniformly to all five applicants, of 70, and an "advancement" rating of 5, a "relatedness" rating of 8, and an "ability" rating of 7. Huntley's composite score was 84, with a basic rating of 70, "advancement" rating of 3, "relatedness" rating of 6 and "ability" rating of 5. Arcenaux, the other black applicant, had a composite score of 81, the basic rating of 70, "advancement" of 2, "relatedness" of 7, "ability" of 3.

In order to achieve the ratings which totalled 90, Bitterwolf had furnished information which had been false in two important respects. The first of these was as follows:

"On September 3, 1968, I was detailed to the warehouse as Acting Chief Warehouse Leader Foreman during Mr. Monson's illness. I was in this position until his return on February 20, 1969. During this time I was in complete charge of all functions of the warehouse, i. e., receiving, issuing, warehousing stock items, as well as receiving, checking and issuing innumerable items for direct delivery to all sections and departments of the hospital. I was detailed in this position for approximately *5½ months*, being relieved of this duty upon Mr. Monson's return on February 20, 1969. Just recently I was detailed to the warehouse again as Acting Chief Warehouse leader foreman during Mr. Monson's recent illness and his subsequent retirement on October 31, 1969, and I am presently still performing in this position." [Emphasis in original.]

When subsequently required to make a statement under oath, he said that he "helped out in the warehouse for four or five months, maybe less, but only when somebody was out. I also went to help when they needed it but this was not continuous." When asked as to which statement was correct, he stated: "I was never the Acting Chief. I was just sent off and on to help but never acted as the Chief until I got the foreman's job."

The second matter relates to his statement on his Form 171 used to evaluate him for the promotion that he was a Chief Petty Officer in the Navy. In fact, he was not a Chief Petty Officer; he had a rating of an E–5, Second Class Petty Officer. When questioned about the discrepancy, he said: "I was not a Chief Petty Officer. I was an E–5, Second Class Petty Officer but acted as a Senior Petty Officer on duty. Question: Since there is a difference between Chief Petty Officer and Second Class Petty Officer, why did you have the Chief designation on your supplemental form. An-

---

1. *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), makes clear that Huntley would have been entitled to a judicial trial *de novo*.

swer: I don't know. Somebody helped me to prepare it. Question: Who helped you to prepare it? Answer: I don't know. I can't remember but I did have help."

Mr. Harvey, the alleged discriminating official who approved the selection, said that the personnel staff had sent to him for interview and selection, Bitterwolf, whose score of 90 gave him a "highly qualified" rating, Mr. Wellmond Arcenaux, Jr., whose score of 81 gave him a "fully qualified" rating and Mr. Robert Huntley, whose score of 84 gave him a rating of "fully qualified." Apparently all scores of 90 or above gave a "highly qualified" and a score between 80 and 90 gave a "fully qualified" rating. Mr. Harvey said: "I selected the number one man listed, not because of race, but because of his high qualifications. Mr. Huntley at the time of selection or thereafter did not discuss his feelings about the selection with me."

The administrative examiner conducting the equal opportunity hearing concluded that:

"By his own admission [and that of Mr. A. H. Harvey] Mr. Bitterwolf *was not detailed officially or otherwise*, to the warehouse as *Acting Chief, but was only intermittently assigned to 'help out.'* Therefore the experience as Acting Chief enumerated in the supplemental 171, submitted for the warehouse foreman position is misstated and *should not be credited as qualifying experience.*

In addition, Mr. Bitterwolf's prior experience is questionable as qualifying for the foreman position. The only other allusion to experience that might be stretched in order to be applicable to warehouse duties is the following reference to his supplemental 171:

'For a period of approximately 16 years during my various tours of duty in the Navy, I was assigned as a Dental Technician which involved maintenance of the supply room for all medical, dental, drugs, and general supplies for all units in the area where I would be assigned. As Chief Petty Officer, Dental Supply, I was in charge of any-

where from three to twenty men at all times, being responsible for their top performance in the various tasks and jobs that would be assigned them.'

Mr. Bitterwolf's 1968 application for re-employment at the New Orleans Hospital (he had been a nursing assistant and a guard) gave his exact title of position in the service as Dental Technician, his classification as E–5 and the description of work as follows:

'Dental Technician—assisted doctor at chair—clerical work—supply room. First Aid and nursing–supervisor–minor repairs to equipment—X-Ray—instructor in dental hygiene and nursing—autocalve [sic] of surgical instruments—oral prophylaxis and fluoride treatment. Clerical work 50%—supervisor—50%.'

*Neither of the above statements appears to qualify Mr. Bitterwolf for the foreman's position as announced.* The qualification requirements stipulated on the announcement No. 510 for the Warehouse Lead Foreman position are as follows:

'Applicants must have had at least 2 years of progressive experience in the performance, of supervision of the performance of duties in one or more normal warehousing activities such as receiving, storing, inventorying, issuing or shipping of various types of equipment, supplies, and parts. Included in or in addition to this experience, applicants must have had at least 6 months of experience performing at the warehouseman level of skills and knowledge with evidence of supervisory qualifications, preferably represented by actual supervising experience.'

The evidence clearly indicates that Mr. Bitterwolf was the beneficiary of a preselection." [Emphasis in original].

Further support for the conclusion of the examiner that Bitterwolf was given improper credit for Acting Chief of the warehouse is contained in a statement made by Arcenaux, one of the former applicants for

the position. He gave his statement for the administrative proceeding as follows:

"After Mr. Monson retired, Mr. Theard was on sick leave for a long time and Mr. Huntley ran the warehouse. He still runs the warehouse. Mr. Bitterwolf does not know how to do the job. He doesn't know how to fix a complete order—he doesn't help with inventory. When the other men were there (Monson and Theard) we all did it. Now only Huntley, Davis, and I do it."

Further, Mr. Theard who had retired as Assistant Foreman of the warehouse stated:

"When Huntley first came, he was a laborer but Mr. Monson [the foreman] was out a lot and I taught Huntley all the jobs in the warehouse. He did Monson's job and mine when we were out. He also did a lot of stock clerk work when those two men were out. He learned all phases of the warehouse operation and could and did do them on his own. I taught him to accomplish a government bill of lading which is very tedious work and you have to be very careful.

Monson and I trained Bitterwolf too when he came to help out but *he did not receive the training that Huntley did.*" (Emphasis added.)

In any event, Bitterwolf was appointed in January, 1970. Thereafter, things did not go well in the warehouse and Huntley filed a formal complaint of racial discrimination, charging improprieties about:

(1) Control of promotions by supervisors;

(2) Unfair distribution of work in absence of immediate supervisor;

(3) Use of discriminatory evaluation;

(4) Used by supervisor to do supervisor's job without just compensation;

(5) Harassment while on sick leave under doctor's care;

(6) Unfairness of granting of holidays or emergency leave.

The first element of alleged discrimination was construed by the examiner to deal with the promotion which we have dis-

cussed above. The examiner who conducted the hearing and made the findings announced his conclusions which included the following:

"Despite Mr. Huntley's superior qualifications, he was denied proper consideration for the Warehouse Foreman position in 1969. Alvin Bitterwolf, as the result of an admittedly falsified supplementary qualifications statement (171) was placed in the position, and through a series of changes in classification standards was elevated to Wage Supervisor 3—*a position that Mr. Huntley would have achieved (based upon the evidence of record) if he had not been unfairly penalized.* [Emphasis added.]

A review of Mr. Bitterwolf's qualifications and experience, as stated on his 171 supplement and other personnel records, by a Classification Specialist in the HSA Personnel Office revealed that Mr. Bitterwolf was only minimally qualified for the Foreman position when given credit for the 5½ month detail as Acting Chief of the Warehouse. Without the 5½ months of detail experience (Mr. Bitterwolf's sworn statements established that he was not detailed nor working in the warehouse for that extended period of time nor did he ever function as the Chief) the Personnel Office substantiated our conclusion that Mr. Bitterwolf was *not qualified* for the Foreman position."

Notwithstanding this conclusion and further findings that several of Huntley's other complaints were justified, the administrator, without stating why, gave him only partial relief. He was to be upgraded to Warehouseman WG–6, effective retroactively to April 29, 1973, date of the alleged discrimination in job classification, and he was also given priority consideration for the next position at the WS–1 level or its GS equivalent (apparently this is the grade to which Bitterwolf had risen).

In the formal decision of the administrator, that part of the investigator's report with his findings and conclusions that included all of the statements quoted above was adopted in its entirety for the Depart-

ment. The Government bases its contention that the appellant did not prove that he would have been appointed in an open vacancy but for consideration of race, upon a paragraph of the director's report which contains the following language:

"Therefore, it is the decision of the Department of Health, Education and Welfare that Mr. Robert Huntley was discriminated against because of his race in the following actions:

(1) Discriminatory control of promotions by supervisors which resulted in the selection of Mr. Alvin Bitterwolf without due consideration of two equally qualified blacks, one of whom was Mr. Huntley."

It is the Government's contention, and it was the holding of the trial court, based on that contention, that this language demonstrated that Huntley could not establish the fact that *but for* the illegal appointment of Bitterwolf, and not Arcenaux, he would have been the appointee. No contention is raised as to Bitterwolf's promotion being the result of racial discrimination.

■ Before we get to the merits of the appeal, however, we must deal with the contention of the Government that the original complaint to the equal opportunity office of the agency should not have been considered because it was filed too late. The simple answer to this contention is that given by the trial court. That is, it is clear that the agency did not decline to accept and process the claim and give it every consideration. The Government concedes in its brief that "Huntley pointed out *appropriately* that the time limits are not necessarily to be rigidly enforced and 5 C.F.R. 713.214(4) provides:

'The agency shall extend the time limits in this section: (1) When the complainant shows that he was not notified of the time limits and was not otherwise aware of them, or that he was prevented by circumstances beyond his control from submitting the matter within the time

limits; of (ii) for other reasons considered sufficient by the agency.' "

We conclude that once the agency accepted the complaint and acted on it, the time limit mentioned in the regulations is not mandatory.[2]

■ The Government has indicated by pre-argument submission, and on oral argument, that it no longer stands on the proposition that retroactive compensation can not be awarded to claimants for acts of discrimination occurring before 1977. It had been the Government's contention on brief that, because Congress did not amend the Civil Rights Act of 1964, to bring the Federal Government within its purview until 1972, "the court has no jurisdiction over a cause of action in which the discriminatory acts occurred before that date." The Government cited *Place v. Weinberger*, 497 F.2d 412 (6th Cir.), *cert. denied*, 419 U.S. 1040, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974), *vacated*, 426 U.S. 932, 96 S.Ct. 2643, 49 L.Ed.2d 383 (1976), for this proposition, but acknowledge that "the courts are divided on this question."

The retroactivity question, however, has recently been decided in this Circuit. In *Eastland v. Tennessee Valley Authority*, 547 F.2d 908 (5th Cir., 1977) the Court made clear that the 1972 Amendments are applicable to administrative claims pending on the effective date of the Amendments. In so holding, this Court joined several other Courts of Appeals which had reached the same result. *See, e. g., Weahkee v. Powell*, 532 F.2d 727 (10th Cir. 1976); *Grubbs v. Butz*, 169 U.S.App.D.C. 82, 514 F.2d 1323 (1975); *Brown v. GSA*, 507 F.2d 1300 (2d Cir. 1974), *aff'd*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (the Supreme Court observing, 425 U.S. at 824 n. 4, 96 S.Ct. 1961, that it had "no occasion to disturb" the Second Circuit's decision on retroactivity).

We perceive no distinction between those cases in which the illegal conduct had occurred prior to the enactment of the 1972 amendment where there was already pend-

---

**2.** We therefore need not decide whether, or under what circumstances, an agency refusal to accept and process an otherwise tardy claim would deprive us of power to hear it.

ing a claim based upon such conduct and a case like the one we are concerned with, where the claim had not yet been filed. In fact, this Circuit had already rejected such a distinction in *Laurel v. United States*, 547 F.2d 917 (5th Cir., 1977). *Laurel* holds that the 1972 Amendments do apply to a claim of pre-Amendment discrimination where that claim was administratively filed several months after the Amendments became effective. *Cf. Ettinger v. Johnson*, 518 F.2d 648, 651 n. 7a (3d Cir. 1975).

We come now to the question of the right of the plaintiff to prevail on the merits of his claim.

It will be remembered that in the personnel classification system in effect in the agency in which the vacancy existed, any applicant with a score between 80 and 90 was known to be "fully qualified" and an applicant with a score of 90 or above was known to be "highly qualified." With that in mind, it seems apparent that by using the language in the decision, in light of the fact that the examiner had found that Bitterwolf was overrated as being highly qualified because of the false statements as to his experience, the director was simply saying that both of the black applicants, Huntley and Arcenaux, were equally well qualified with Bitterwolf. We do not believe that this decision, which, as pointed out above, adopted and incorporated the examiner's report as to this particular matter, meant to ignore or overrule the latter's conclusion that Bitterwolf " . . . was elevated to Wage Supervisor 3—a position that Mr. Huntley *would have achieved* (based upon the evidence of record) if he had not been unfairly penalized." (Emphasis added.)

We are even more persuaded to this view by the testimony of the supervisors that they selected the top person on the list, and the finding of the examiner that Huntley had been denied points on his rating that he was entitled to by reason of running the warehouse during the absence of the foreman and assistant foreman, and by Arcenaux's own statement which clearly indicated that Huntley was the better qualified

of the two. Arcenaux, in effect, said that Huntley was the only person who had complete grasp of all of the tasks that had to be performed in the warehouse.

In sum, it seems perfectly clear that the examiner's conclusion, adopted by the Department that due to racial discrimination, Bitterwolf had improperly been appointed to the job "that Mr. Huntley would have achieved . . . if he had not been unfairly penalized" is about as complete a finding of satisfaction of the "but for" requirement as can be imagined.

■ Where the "but for" test has been met, Civil Service regulations require the award of back pay, 5 C.F.R. § 713.281(b) (1976) provides:

"(b) *Remedial action involving an employee.* When an agency, or the Commission, finds that an employee of the agency was discriminated against and as a result of that discrimination was denied an employment benefit, or an administrative decision adverse to him was made, the agency shall take remedial actions which shall include one or more of the following, but need not be limited to these actions:

(1) Retroactive promotion, with backpay . . . when the record clearly shows that but for the discrimination the employee would have been promoted or would have been employed at a higher grade. . . ."

We hold that this record clearly shows that Huntley would have been promoted but for the discrimination in Bitterwolf's favor.

The judgment is therefore reversed and the case is remanded with directions that the trial court enter judgment for the plaintiff for such amount as he is entitled to receive under the law and regulations. Huntley has already been promoted to the "warehouse foreman" job he was denied by the discrimination against him. Hence we need not order such promotion. Huntley is entitled, however, to whatever benefits, in terms of seniority or the like, will flow from giving his promotion retroactivity effect. We leave to the trial court, in the first instance, the question of whether, under the

1972 Amendments, the promotion can be made effective as of January 1970, when Huntley suffered this discrimination, or only as of some later date.

 Finally, the trial court should also address the plaintiff's claim for attorneys' fees, which the Court may allow to the prevailing party, pursuant to 42 U.S.C.A. §§ 2000e–5(k), 2000e–16(d) (1974). *Cf. Bradley v. School Bd. of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

REVERSED and REMANDED with directions.