Arthur HILL, Plaintiff,

v.

UNITED STATES POSTAL SERVICE, et al., Defendants.

No. 77 Civ. 3294 (JMC).

United States District Court, S. D. New York.

Sept. 3, 1981.

Legal Action Center for the City of New York, Inc., New York City (Margaret K. Brooks, Catherine H. O'Neill and Paul N. Samuels, New York City, of counsel), for plaintiff.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City (Richard N. Papper, Asst. U. S. Atty., New York City, of counsel), for defendants.

## OPINION

CANNELLA, District Judge:

After a trial on the merits of plaintiff's amended complaint, the Court finds for defendants. The amended complaint is dismissed.

## FACTS

Plaintiff Arthur Hill, a black man, alleges that the former policies and practices maintained by defendants, the United States Postal Service and several of its officials, respecting the employment of individuals with criminal records, discriminated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the due process clause of the fifth amendment.[1] Hill and three other Postal Service applicants, Earl Sutherland, Anthony Ferruzzi and Darryl Robertson, who had been denied employment allegedly on the basis of their prior convictions, commenced this action on July 7, 1977.[2] At that time, Postal Service policies and procedures governing the assessment of suitability of applicants were contained in a revised Personnel Handbook, Series P–11 [the "Handbook"], which provided in pertinent part:

313.2 *Partial List of Reasons Which May Disqualify Eligibles*

In making selections for any type of accession, determination must be made whether an eligible or applicant might be disqualified for reasons such as the following:

a. Dismissal from prior employment for cause.

b. Criminal or other conduct of such nature which, if engaged in by a postal employee, would undermine the efficiency of the Postal Service.

---

1. Jurisdiction is asserted pursuant to 28 U.S.C. §§ 1331, 1361 and 42 U.S.C. §§ 2000e–5(f)(3), 2000e–16.

2. This action was originally assigned to Judge Pierce and transferred to this Court for trial on the amended complaint.

c. Intentional false statements, deception, or fraud in examination or appointment.

d. Refusal to furnish requested testimony or information to the Postal Service, or the appointing officer, which has been requested pursuant to applicable laws, rules and regulations.

e. A history of habitual use of intoxicating beverages to excess.

f. Abuse of narcotics or dangerous drugs.

g. Reasonable doubt as to the loyalty of the eligible to the Government of the United States.

h. Conviction of theft or embezzlement.

i. Conviction of crimes of violence, including assault with a deadly weapon.

j. Any legal or other disqualification which makes the applicant unfit for the Postal Service.

### 313.4 Criminal Convictions

.41 Use of Arrest Records

.411 Arrests for criminal charges should be given no consideration in evaluating an applicant for employment, if the charges have been dismissed, if there has been an acquittal, if the proceedings have otherwise not resulted in a conviction, or where the record of such charges does not contain or reflect an actual conviction on such charges.

.412 No inquiries should be made, either orally or in writing, of the applicant or of any other person, concerning arrest records, except where the arrest actually resulted in a criminal conviction, or where the charges are still pending. In addition, when inquiring as to the conviction record of any applicant for employment from any person or agency, including law enforcement agencies, postal officials shall state orally, or in writing, that:

It is not the policy of the U.S. Postal Service to inquire into the arrest records of applicants for employment, where the charges arising out of an arrest have been dismissed, there has been an acquittal, the proceedings have otherwise not resulted in a conviction, or where the record of such charges

does not contain or reflect an actual conviction of such charges. If possible, please exclude all such charges in the requested conviction record, except those still pending.

.413 Appointing officials are not prohibited from considering or inquiring into criminal charges pending against any applicant. If the appointing official receives any records or information where the deposition of a criminal charge is not adequately reflected, or where the charge is still pending, the applicant is to be given an opportunity to explain the surrounding circumstances of the charges and whether the charges have been terminated in his or her favor.

.42 Serious Crimes

Where the eligible has been convicted of a serious crime, such as a felony involving an act of violence, armed robbery, assault with a dangerous weapon, arson, etc., or a series of minor crimes (misdemeanors), additional inquiry should be made:

a. If the application form is incomplete or contains false statements or unaccounted periods or an otherwise poor record, the appointing official must make further checks.

b. If the applicant has been imprisoned and/or placed on parole, the warden, or officer in charge of the institution(s) involved should be queried regarding the eligible's conduct, cooperation, progress toward rehabilitation, etc. Similarly, parole officers and social service workers or agencies should be questioned regarding cooperation, attitude, problems, if any, progress toward rehabilitation, and employability.

.43 Conviction Records

After reviewing all available information concerning the eligible, the following actions will be taken:

a. If the applicant's conviction record contains only one minor incident (misdemeanor) the appointing officer may make the appointment.

b. If the applicant's conviction record shows that, in recent years, the individual has been convicted of a felony or of a misdemeanor involving acts of violence or dishonesty, or of an unusual number of

misdemeanors, the applicant should normally be removed from the register. If, for any reason, the installation head believes that special consideration should be given to the applicant, the entire file should be submitted by him/her to the Regional Director of Employee Relations with reasons for recommending appointment. If the said regional authority concurs with the recommendation of the installation head, the regional authority will authorize the appointment.

c. If criminal charges are pending against an applicant, and conviction would make the applicant unsuitable, no action should be taken on the application until the charges are resolved.[3]

Plaintiffs contended that the above policy respecting persons with criminal records resulted in the automatic exclusion of persons

**3.** *See* Plaintiff's Exhibit 12 [hereinafter Plaintiff's Exhibits will be referred to as "PX ＿＿＿＿" and Defendants' Exhibits will be referred to as "DX ＿＿＿＿"]. This revision became effective December 31, 1975. The prior version of the Handbook, which became effective October 1, 1971, was substantially similar with respect to the treatment of criminal records and provided in pertinent part:

312.2 Where the eligible has been convicted of a serious crime, such as a felony involving an act of violence, armed robbery, assault with a dangerous weapon, arson, etc., or a series of minor crimes (misdemeanors), additional inquiry should be made:

a. Include checks with parole officers, social service workers or agencies, and the warden or other head of any penal institution in which the individual has been confined. The case should be reviewed to determine that the eligible meets the suitability standards of the Postal Service.

. . . .

313 *Appointment Approval*

After reviewing all available information concerning the eligible the following actions will be taken:

a. If the derogatory information concerns only one minor incident (misdemeanor), or if it was determined that the derogatory information was not identified with the eligible, the postal installation head may make the appointment. The installation head should keep in mind that only suitable persons should be employed.

b. If the derogatory information shows that the individual has been convicted of a felony in recent years, or at any time of an act of violence or notorious or immoral conduct or is currently debarred by the CSC, the postal installation head should refer the case to the appropriate regional authority for decision as to the eligible's employability. If for any reason the installation head believes that special consideration should be given to such an appointment, the entire file should be submitted by him to the appropriate regional authority with reasons for recommending appointment. This would also apply to convictions for an unusual number of misdemeanors, usually three or more, or of two or more misdemeanors if they involve the same offense and were within recent years. (Postal Service suitability standards are not limited to the 2-year period on felonies and 1 year on misdemeanors and discharges generally used by the Civil Service Commission.) If the regional authority concurs with the recommendation of the installation head, he will authorize the appointment. (This decision is final.)

. . . .

314.4 *Former Convicts or Parolees*

In all cases in which derogatory information shows imprisonment and/or parole, the warden, or officer in charge of the institution(s) involved should be queried regarding the eligible's conduct, cooperation, progress toward rehabilitation, etc. Similarly, parole officers should be queried regarding cooperation, attitude, problems, if any, progress toward rehabilitation, and employability.

314.5 *Partial List of Reasons Which May Disqualify Eligibles*

In making selections for any type of accession, determination must be made whether an eligible or applicant might be disqualified for reasons such as the following. Such cases will be forwarded to the appropriate regional authority for advice and/or decision as to employability:

a. Dismissal from employment for delinquency or misconduct;

b. Criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct;

c. Intentional false statements or deception or fraud in examination or appointment;

d. Refusal to furnish testimony as required by the Civil Service Commission, the Postal Service, or the appointing officer, arising under laws, rules, and regulations;

e. Habitual use of intoxicating beverages to excess; drug addiction or sexual perversion;

f. Reasonable doubt as to the loyalty of the person involved to the Government of the United States;

g. Conviction of theft or embezzlement;

h. Conviction of crimes of violence, including assault with a deadly weapon; or

i. Any legal or other disqualification which makes the applicant unfit for the Postal Service.

*See* PX 11.

with felony or serious misdemeanor convictions and thus was not rationally related to the applicant's ability to perform satisfactorily as a postal employee. They also contended that the policy had a significant and disproportionate impact on minority group members since, in proportion to their representation in the general population, minorities are allegedly more often arrested and convicted of crimes than non-minorities.

4. The new standards, which are not challenged in this case, are contained in section 313.3 of the revised version of the Handbook:

313.3  *Hiring Policy on Applicants with Criminal Records*

.31  *Applicability.* This statement of policy is issued for the guidance of hiring authorities investigating, reviewing, and rating employment applications for postal positions from persons with histories of criminal arrest or conviction. These standards do not apply to those positions designated as *sensitive* by the Postal Service.

.32  *Background and Purpose.* The Postal Service recognizes that many persons with criminal records are capable of faithfully executing the duties associated with postal employment, and that they are entitled to compete for jobs on their individual merits. It is the obligation of hiring authorities to assess job applicants' criminal records fairly. The intent of this is to enable appointing officials to fulfill this obligation in a manner consistent with the Postal Service's primary duties to maintain the security of the mail and to assure public trust in the integrity and reliability of postal employees.

.33  *Use of Arrest Records*

.331  No inquiries may be made, either orally or in writing, of the applicant or of any other person, concerning arrest records, except where the arrest actually resulted in a criminal conviction, or where the charges are still pending. In addition, when inquiring as to the conviction record of any applicant for employment from any person or agency, including law enforcement agencies, postal officials must state orally, or in writing, that:

It is not the policy of the U.S. Postal Service to inquire into the arrest records of applicants for employment, where the charges arising out of an arrest have been dismissed, there has been an acquittal, the proceedings have otherwise not resulted in a conviction, or where the record of such charges does not contain or reflect an actual criminal conviction of such charges. If possible, please exclude all such charges in the requested conviction record, except those still pending.

See Appendix D–3 for sample letter of conviction inquiry.

Thereafter, the parties entered into settlement discussions which culminated in Judge Pierce's approval of a Consent Order and Judgment (filed July 27, 1979) [the "Consent Order"]. The Consent Order provides in pertinent part that within six weeks from the entry thereof the Postal Service would circulate revised employment standards, agreed upon by the parties,[4] governing applicants with criminal records, and

.332  Arrests for criminal charges must be given no consideration in evaluating an application for employment:

a.  If the charges have been dismissed;

b.  If there has been an acquittal;

c.  If the proceedings have otherwise not resulted in a criminal conviction; or

d.  Where the record of such charges does not contain or reflect an actual criminal conviction on such charges.

.333  Hiring authorities must also recognize that young persons arrested on criminal charges may be subject to adjudications in juvenile courts under juvenile offender statutes, and that in many jurisdictions these adjudications are not deemed to be criminal convictions. Such adjudications are not to be considered in evaluating an applicant for employment.

.334  Appointing officials are not prohibited from considering or inquiring into criminal charges pending against any applicant at the time the application is considered. If the appointing official receives any records or information where the disposition of a criminal charge is not adequately reflected, or where the charge is still pending, give the applicant an opportunity to explain the surrounding circumstances of the charges and whether the charges have been terminated in the applicant's favor. Pending criminal charges must not result in the automatic rejection of the applicant (see 313.-36).

.34  *Use of Conviction Records*

.341  In evaluating an applicant's conviction record, appointing officials may consider only the nature of the offense(s) of which the applicant has actually been convicted, and not the nature of the offense(s) with which the applicant may have been charged prior to conviction.

.342  In those instances where an applicant's criminal conviction has been set aside, vacated, or annulled, expunged or sealed, pursuant to statute or court order, that conviction may not serve as a basis for the disqualification of the applicant for employment. No inquiry, either oral or written, may be made, either directly or indirectly, into any applicant's conviction where the conviction has been set aside, vacated, or annulled, expunged or sealed.

.343  It is USPS policy to evaluate the employability of each applicant with a criminal

that within ten days from entry thereof the Postal Service would offer Robertson, Suth-erland and Ferruzzi immediate employment with the Postal Service. The Consent Or-

conviction record individually. The mere fact that an applicant has a criminal conviction record is not sufficient to disqualify that applicant from postal employment. Instead, an applicant should be rejected on the basis of a history of criminal conviction only after a specific finding that that history is directly related to the applicant's present capacity to perform as a Postal Service employee. To the extent available, such factors as the following must be considered during such an evaluation:

a. The applicant's age at the time of the offense(s).

b. The nature of the offense(s) and the underlying circumstances of the offense(s).

c. Length of time elapsed since the applicant's offense(s).

d. Evidence of efforts made by the applicant toward rehabilitation, including job training or educational programs the applicant may have participated in while incarcerated.

e. Information supplied by penal authorities, parole and probation officers, social service workers or social agencies regarding the applicant's progress toward rehabilitation or employability.

f. The applicant's prior employment record, including participation in a job training program.

g. Dispensations which may have been granted by state or federal authorities to evidence the applicant's rehabilitation or relieve the applicant of disabilities to which the applicant may have been subject upon conviction (e. g., certificates of relief from disabilities, certificates of good conduct, certificates restoring civil rights).

h. The nature and location of the Postal Service position that the applicant seeks.

.344 In those instances where an applicant has neither received a criminal conviction during the 10 years immediately preceding the date of the application, nor been incarcerated as a result of a criminal conviction during the 5 years immediately preceding the date of the application, the applicant's conviction record may not serve as the sole basis for disqualification from appointment.

.35 *Applicants on Probation or Parole.* Applicants subject to probation or parole supervisions as a result of criminal conviction may not be rejected for employment solely as a result of such supervision. Such applicants are entitled to individual evaluation for positions under 313.343.

.36 *Applicants with Pending Criminal Charges.* An applicant subject to pending criminal charges is eligible for appointment to employment. However, if conviction on the charges would make the applicant unsuitable under 313.343,

a. No action may be taken on the application until the charges are resolved, and

b. The applicant's eligibility for appointment is extended for the life of the applicant's eligibility on the register.

.37 *Verification of Accuracy of Criminal Record Information.* In making determinations regarding applicants with criminal records, hiring authorities must take special care to ensure the accuracy of criminal record information they may receive from law enforcement authorities or other agencies. Where discrepancies exist between such information and that reported by the applicant (e. g., convictions not reported by the applicant) the applicant must be sent a letter of inquiry as provided in 315.1. The appropriate content of a statement to accompany a letter of inquiry regarding an applicant's criminal record is contained in Appendix D–2.

.38 *Career Opportunities.* Persons who have criminal records at the time of their appointment to Postal Service employment may not be discharged or denied transfer, assignment, or promotion to any postal positions except those designated *sensitive,* as a result of such records. This does not preclude the Postal Service from taking appropriate disciplinary action, including removal, against an employee for falsification of any employment application form.

313.4 *Sample Suitability Considerations*
The following three examples show the type of reasoning that should accompany suitability determinations. Supporting documentation must be retained in the *Hiring Worksheet* file.

*Example A:*
Applicant, while an adult, was convicted of armed robbery 11 years ago. The applicant served 4 years in prison, and was released 7 years ago. During the past 7 years, applicant had several different jobs, in different areas of the country. In checking with the applicant's previous employers, the appointing official has learned that the applicant was separated for cause from 2 jobs, and had attendance problems.

The conviction may be considered, but may not be used as the *sole* basis for disqualification (see 313.344). However, the conviction, coupled with the more recent adverse employment record, would support a determination of "unsuitable."

*Example B:*
Applicant, when 22 years old and in college, was convicted of malicious mischief as a result of breaking windows. Thereafter, he completed military service with an honorable discharge, following which applicant completed 4 years of college, earning a BA degree while working at night. Applicant is now 28 years old, and has no other convictions.
Applicant should be declared "suitable."

*Example C:*

der further provides that "[w]ithin thirty (30) days from the date of entry of this Order, plaintiffs shall file an amended complaint setting forth claims for relief and the basis for such claims of plaintiff Arthur Hill." *Id.*, ¶ 5.[5] On August 24, 1979, Hill filed his amended complaint wherein he restates his claims that the defendants' former policies and practices regarding the employment of individuals with criminal records violated Title VII and the fifth amendment. Hill seeks declaratory relief, reinstatement, back pay and retroactive benefits.

The trial of this action was held on April 30 and May 4, 1981. The evidence adduced at trial established that the Postal Service first employed plaintiff as a temporary mail handler at the New York General Post Office ["GPO"] from February 26, 1958 until he resigned on May 6, 1960. *See* Court's Exhibit 1, ¶ 1(a). At the time of plaintiff's resignation, the Postal Service had authorized his removal on charges of tardiness and being absent without permission from January 24, 1960 to February 9, 1960. *See* Transcript of Proceedings at 29–31, *Hill v. United States Postal Service, et al.*, 77 Civ. 3294(JMC) (dated April 30 and May 4, 1981) ["Tr."]; DX A at 173, 203–04, 211, 214, 217, 223. Thereafter, the Postal Service employed plaintiff from March 4, 1961 to May 26, 1962 as a mail handler in the Brooklyn Post Office. He resigned this position to return to school. Tr. at 31.

On August 19, 1963, plaintiff was again employed as a mail handler at GPO. On May 21, 1964, the Postal Service notified plaintiff of his proposed removal based upon charges that he had been tardy thirteen times in April and that he had threatened to break his supervisor's legs when the supervisor allegedly went to his home to investigate plaintiff's absence from work on May 16 through May 19, 1964. *See* Tr. at 32–36; DX A at 137–38. Although Hill denied threatening his supervisor, *see* DX A at 128, both charges were sustained, *see* DX A at 116. Nevertheless, rather than firing Hill, the Postal Service extended leniency to him by issuing a letter of reprimand. Tr. at 36. In addition, the Postal Service had previously given plaintiff notice of removal or disciplinary action for failure to pay certain debts on February 25, 1964 and letters of warning were issued for the same charge on November 4 and December 6, 1963 and January 6 and February 11, 1964. *See* Tr. at 37; DX A at 149, 154. Moreover, plaintiff received letters of warning for tardiness on March 4, April 30 and May 5, 1964. Tr. at 38; DX A at 211–12. Plaintiff resigned from his position on June 21, 1964.

The Postal Service once again employed plaintiff in 1967 through December 9, 1968.[6] *See* Court's Exhibit 1, ¶ 1(d)–(h). During this period, Hill passed the necessary quali-

Applicant was a 25 year old bank teller, and was arrested for embezzlement 3 years ago. The applicant agreed to make restitution, and resigned the position with the bank. Due to the bank's desire to avoid adverse publicity, the employee was never prosecuted, and the charges were dropped. Following this incident, the applicant developed an unstable work record.

The arrest may *not* be considered, but the adverse employment information obtained from the bank, unrefuted by the applicant, as well as the recent unstable employment, should be considered. Note the applicant's adulthood at the time of the incident, the recency of the incident, and the similarity between the type of offense and the opportunity for such a theft in Postal employment. The postal employee, like a bank teller, has a fiduciary responsibility for the property of others. These facts and considerations would support a determination that the candidate is "unsuitable."
*See* DX D–2.

5. The Court originally found the language of paragraph 5 of the Consent Order susceptible to two interpretations: (1) that Hill preserved his claims challenging the former Postal Service policies and practices, and (2) that Hill agreed to reapply under the new regulations and thereafter file an amended complaint containing his claims for relief. The Court now finds, however, that the parties intended to preserve Hill's claims challenging the former policies and practices.

6. Plaintiff has been employed as a laborer in the New York City Parks Department since June 1977. He was employed by the Parks Department for a period in 1968 and again from 1972 until he was laid-off in 1975 because of the City's financial crisis. *See* Tr. at 25.

fying examinations and was employed as a motor vehicle operator ["MVO"] and a tractor trailer operator. On April 19 and 23, 1968, plaintiff reported for work but refused to perform his assigned runs, stating that the tractor trailers assigned to him were defective. The tractor trailers, however, were found to be in good working condition. On June 20, 1968, after being examined at the United States Postal Service Hospital and diagnosed as having a paranoid personality, plaintiff was found to be unfit for duty. See DX B at 64. Accordingly, on September 3, 1968, the Postal Service sent plaintiff a notice of proposed separation, see DX B at 39, which became effective December 9, 1968, see DX B at 81. Plaintiff then appealed his removal to the Civil Service Commission ["CSC"]. The CSC reversed the discharge because the notice of proposed separation did not give plaintiff sufficient notice that the reason for his discharge was his unfitness for duty due to his mental illness rather than his conduct in refusing to operate the tractor trailers. See Tr. at 41–42; DX B at 67–69. Therefore, on June 16, 1969, the Postal Service notified plaintiff that he could report for reinstatement. DX B at 70. By that time, however, plaintiff had been arrested for manslaughter in the first degree for the death of his child. Plaintiff later pleaded guilty to criminally negligent homicide, see

Tr. at 42, and served ten months of a three-year sentence.[7] The Postal Service then removed plaintiff for conduct unbecoming a postal employee. DX A at 1.

After plaintiff was released from prison in August 1970, he applied for reinstatement at the GPO, at which time he disclosed his conviction. He was interviewed and subsequently received a letter informing him that he would not be reinstated because of his past Postal Service record. See Tr. at 42–43; PX 1, DX B at 12. Nevertheless, after passing the necessary examination, plaintiff applied for the position of MVO in 1972, again disclosing his conviction. See DX B at 16, 19. Personnel clerk Rudolf Covino interviewed plaintiff on March 16, 1972. On March 20, 1972, plaintiff was notified that he would not be hired. See PX 2; DX B at 84. Plaintiff testified that no one ever told him that his conviction was the reason he was not reinstated in 1970 or hired in 1972, see Tr. at 42, 44, and in fact the 1970 denial of reinstatement specifically referred to his past service record. With respect to Hill's 1972 application, however, an index card file kept in the personnel office[8] and a notation on Hill's interview call-in notice[9] refer to his criminal record. See DX B at 15, 20, 88. Hill did not administratively appeal either of these decisions until 1976 and claims he was never informed of his right to do so.[10]

7. The circumstances of the incident resulting in this conviction were not revealed at trial.

8. Samuel Henderson, a former employment officer at the GPO, testified that the appointment unit kept an index card file of applicants who had been denied employment because of some serious derogatory information. The purpose of the file was to alert personnel clerks in the appointment unit of the information even before the clerk received the applicant's official personnel folder. These folders are kept in St. Louis, Missouri and their transmittal from there to the personnel clerk can take anywhere from a few days to four weeks. Thus, the index card file stresses the need to obtain the personnel folder before any action is taken on an application even when temporary employment is being sought. Tr. at 74–76. Hill's index card contained his name, address, date of birth, social security number and stated "NS for MVO ptfs on 03/16/72 Arrested 10/29/68 New York, N.Y. Found guilty of criminally

negligent homicide sentenced to maximum of 3 years. Removed NYPO on 03/02/70." See DX B at 20. "NS for MVO ptfs" means "Not suitable for motor vehicle operator. Part-time flexible schedule." Tr. at 109.

9. Rudolf Covino made the following notation on plaintiff's interview call-in notice: "NS–DNR [8 or 2]/10/72 (RC) Arrest Record." See DX B at 15, 88; Tr. at 108. "NS–DNR" means "Not suitable-do not reconsider." This notation was followed by a date which is unclear, Covino's initials, and the reference to plaintiff's arrest record.

10. Samuel Henderson, the GPO employment officer in 1972, testified that during this period a letter of denial did not notify an applicant of his right to appeal although the applicant would receive verbal notification of that right if he telephoned concerning the decision on his application. See Tr. at 77. There is no indication that plaintiff made such a telephone in-

In March 1976, plaintiff applied for a tractor trailer operator position at the Hicksville, New York Post Office and he disclosed his conviction in that application as well. See DX C at 7–10. He was hired on May 13, 1976 as a temporary tractor trailer operator, see DX C at 11, but was terminated on May 19, 1976 because of unsatisfactory performance. DX C at 12. Thomas J. Cotter, the Manager of Motor Vehicle Operations at Hicksville at the time, testified that plaintiff's trip ran late on two consecutive nights and that plaintiff had been found eating hamburgers in a Burger King restaurant during one such late trip. When Cotter questioned plaintiff about his conduct on May 19, 1976, plaintiff began to rant and curse. Cotter nevertheless advised plaintiff that his employment was terminated effective immediately and asked for his badge and government driver's license. Plaintiff threw the badge past Cotter's head, threw the license on the floor and left. Tr. at 113–14. Cotter reported this incident to the Postal Service Director of Employee and Labor Relations on May 20, 1976. DX C at 12.

Thereafter, plaintiff passed the examination for the position of custodial laborer and applied for that position at the Jamaica Post Office. On October 5, 1976, plaintiff was given a pre-employment interview by Albert Chiarella, a personnel clerk at the Jamaica Post Office. See Tr. at 80. At that time, plaintiff filled out a form which revealed his conviction. Tr. at 26–27, 45. His conviction, however, was not discussed during the interview. Tr. at 46. When he was not notified of the status of his application by November, plaintiff telephoned the Jamaica Post Office and spoke to an individual that he thought was Chiarella. Plaintiff testified that he was told that he would not be hired because of his conviction. Tr. at 46.[11]

Previously, on January 31, 1976, plaintiff had filed an informal complaint with a Postal Service Equal Employment Opportunity ["EEO"] Counselor, alleging that the sole reason he was denied reinstatement in 1970 and denied employment on March 20, 1972 was a Postal Service policy against hiring individuals with criminal records. He contended that the policy constituted a continuing discriminatory practice because of its disproportionate impact on minorities. See DX B at 9–10. Plaintiff filed his formal complaint of discrimination on February 27, 1976. See PX 3. On June 22, 1977, John G. Werner, the Acting Manager, EEO Branch, Northeast Region, sent a "Notice of Proposed Disposition of Discrimination Complaint" to plaintiff. This notice states that plaintiff's allegations of racial discrimination were not supported because race was not a factor in the Postmaster's determination of his unsuitability:

Six (6) Motor Vehicle Service employees (Four (4) Black and two (2) Caucasian) were removed for conduct unbecoming a postal employee because of the imposition of penal sentences. All of their applications for rehire were reviewed and given unfavorable consideration on the ground of their individual unsuitability for rehire purposes, in the opinion of the Postmaster. Race was not a factor considered in making those determinations.

PX 4. On April 4, 1978, Charles Scialla, the Regional Director, Employee and Labor Relations, United States Postal Service, informed plaintiff that the Proposed Disposition was adopted as the final agency decision. See PX 5.

On December 3, 1976, plaintiff filed a second informal complaint with an EEO counselor alleging that he was denied employment at the Jamaica Post Office in November 1976 because of the Postal Service policy against hiring individuals with criminal records and that this policy constituted a continuing discriminatory practice because of its disproportionate impact on minorities. See PX 6. At trial, plaintiff

---

quiry regarding his 1970 or 1972 applications. Denial letters now inform applicants of their right to appeal.

11. It is uncertain whether plaintiff received a letter denying his application from the Jamaica Post Office since their records could not be located.

testified that he met with an EEO counselor who told him and his lawyer that he was not hired because of his conviction. *See* Tr. at 28. The counselor, Eugenio Castro, also asked plaintiff to submit additional information concerning his conviction. Plaintiff complied with this request,[12] but Castro's report indicates that the Manager of Employee and Labor Relations at the Jamaica Post Office found that plaintiff's application still did not meet the requirements for hiring. *See* PX 7; DX B at 101. The report further indicates that Castro interviewed the Employment Officer at the Jamaica Post Office, Chiarella's superior, who stated that the procedures contained in section 313.42 of the Handbook had been followed in processing Hill's application. However, Chiarella, when interviewed, stated that he informed plaintiff of the Postal Service policy prohibiting the employment of an individual with a criminal record. *See* PX 7 at 2; DX B at 101.

On April 20, 1977, plaintiff filed his formal complaint of discrimination. *See* PX 9; DX B at 97–98. By letter dated December 28, 1979, the Regional Director of Employee and Labor Relations informed plaintiff that his complaint had been cancelled for failure to prosecute because of the simultaneous litigation of the instant action. *See* PX 10.[13]

Several postal officials testified to the Postal Service's former policies and practices concerning the employment of persons with criminal records. Plaintiff's witness, Samuel Henderson, was the Employment Officer at the GPO from 1970 through 1973. During this period his employment assistants were Jack Eichenholtz, Ralph Romano and Rudolf Covino.[14] Henderson testified that after an applicant took an examination, he would be ranked on a list according to his score. When additional employees were needed, applicants would be called in for pre-employment interviews as their names were reached on the list. At the interview, the applicant would complete an application which is reviewed by a personnel clerk. If the clerk found any material derogatory information in the application, such as a criminal conviction, he would notify one of his supervisors, the employment assistants, who, in 1972 at the GPO, were Eichenholtz, Romano and Covino. Tr. at 64–65. At that point, the applicant would be interviewed by the employment assistant. Henderson testified that in his opinion the procedures followed in 1972 as set forth in the 1971 Handbook, *see* PX 11, were substantially similar to the procedures followed in 1976 as set forth in the 1975 revision of the Handbook. *See* PX 12; Tr. at 68–69. He further testified that he followed these regulations and that he could not recall ever recommending a convicted felon for appointment. He could not say with assurance whether Eichenholtz or others in the appointment unit had made such recommendations. Tr. at 69–70, 73.

Eichenholtz, who is presently the Supervisor of Employment and Placement at the GPO, testified for defendants that under the regulations in effect in 1972, like those now in effect, the applicant's total background was considered in determining his suitability. Tr. at 93. Among the factors normally considered were the applicant's previous employment history [15] and military

---

**12.** Plaintiff submitted a letter from his Parole Officer that stated that plaintiff had abided by the conditions of his parole and maintained stable employment during that period. *See* PX 8.

**13.** Plaintiff timely commenced the present action on July 7, 1977, which was more than 180 days after he filed his administrative claim of discrimination on December 3, 1976. *See* 42 U.S.C. § 2000e–16(c).

**14.** Covino was a personnel clerk who at times performed as an acting supervisor. Eichenholtz supervised Romano and Covino.

**15.** Section 315.1 of the 1971 Handbook, *see* PX 11, and section 313.5 of the 1975 revised Handbook, *see* PX 12, contained substantially similar provisions governing the assessment of an applicant's prior work history. Section 313.5 of the 1975 revised Handbook provides:

An eligible may be omitted from consideration for employment because of previous unsatisfactory service. The service must have been sufficiently long to be considered a full and fair trial and the character of the service must have been such that the eligible is unlikely to be able to perform satisfactorily in the new position. Situations which may fall

service, and his criminal conviction record, if any. Tr. at 93. Eichenholtz further testified that when an application indicated that the applicant had previously been employed by the Postal Service, the appointment unit would send for his Postal Service employment record and review it before any decision on his application would be made. Tr. at 98–99. Although he does not recall reviewing plaintiff's application in 1972, he did review plaintiff's employment record during the course of the EEO investigation and found that even if plaintiff had never been convicted of a felony, he would not have been found suitable for employment because of his prior poor Postal Service employment record. *See* Tr. at 95–97; DX B at 55–56. In addition, Eichenholtz testified that he has on occasion approved the appointment of convicted felons. Tr. at 97.

Covino, who interviewed plaintiff on March 16, 1972, *see* DX B at 16, testified that he normally processed between 150 and 200 employment applications daily and that he had no recollection of processing plaintiff's application in 1972. Covino further testified that his disapproval of plaintiff's application meant that plaintiff did not meet the suitability requirements contained in the Handbook. In addition, Covino testified that according to his understanding of the regulations concerning criminal convictions in effect in 1972, a felony conviction

did not automatically bar an individual from employment since other factors, such as the amount of time between the conviction and the application for employment, the applicant's intervening work record and his prior experience with the Postal Service, were also considered. *See* Tr. at 102. Covino later testified, however, that the Postal Service had a policy against hiring anyone who had been convicted of a felony. Tr. at 106. Like Eichenholtz, Covino also reviewed plaintiff's Postal Service employment record during the EEO investigation in 1976 and submitted an affidavit outlining plaintiff's poor prior employment record with the Postal Service. *See* Tr. at 103–04; DX B at 57–58. Although Covino had no recollection of reviewing plaintiff's application in 1972, he testified that that affidavit reflects his impression of plaintiff's application following the normal procedure of reviewing the applicant's prior Postal Service employment record and other available information in addition to his conviction record. Tr. at 105.

Finally, plaintiff submitted statistical evidence of the proportion of minorities in the general population and the proportion of minority arrests and convictions in the general population for a number of different time periods and geographic areas. *See* PX 14, 15.[16] The Court has gleaned the following data from plaintiff's submissions:

1. United States—General Population (in thousands):

| | — 1960 (April 1) — | | | — 1970 (April 1) — | | |
|---|---|---|---|---|---|---|
| | White | Black | Other | White | Black | Other |
| United States | 158,832 | 18,872 | 1,620 | 178,158 | 22,589 | 2,558 |
| New York State | 15,287 | 1,418 | 78 | 15,891 | 2,170 | 181 |

in this category are: termination of appointment in the same or another post office for unsatisfactory service; repeated scheme failure, when ability to learn a scheme will be required; or misconduct on the job. Excessive tardiness or absence, or poor conduct in previous post office employment, although no disciplinary action was being taken at the time of resignation, could justify eliminating an eligible from consideration, if the service was recent and there is no indication that the individual has improved his or her work habits. It is the policy of the Postal Service to refuse employment to persons who were removed from the Postal Service or from other

Federal employment for cause or who resigned after being notified that charges proposing removal would be, or had been, issued. Prior approval of the Regional Director of Employee Relations must be obtained before employing any such former postal or federal employee.

**16.** Defendants have stipulated to the authenticity of the statistical evidence contained in PX 14 but dispute the relevancy of statistical evidence for years other than 1976 as well as statistics dealing with arrests rather than felony or serious misdemeanor convictions.

|  | — 1975 (July 1) — | | | Percent Black of Total | | |
|  | White | Black | Other | 1960 | 1970 | 1975 |
| United States | 185,141 | 24,435 | 3,456 | 10.5 | 11.1 | 11.5 |
| New York State | 15,434 | 2,382 | 260 | 8.4 | 11.9 | 13.2 |

*See* PX 14, Statistical Abstract of the United States, 1978, Table No. 35, Resident Population, By Race—States: 1960 to 1975 (footnote omitted).

2. New York City—General Population (in thousands):

| — 1960 — | | — 1970 — | |
| Total | Percent Black | Total | Percent Black |
| 7,782 | 14.0 | 7,895 | 21.1 |
|  |  | Other Minorities | |
|  |  | 178 | |

*See id.,* Table No. 24, Cities with 100,000 Inhabitants or More in 1970—Population, 1950 to 1976 [estimates], and Area, 1970.

3. Persons Arrested in the United States:

| Item | Unit | 1970 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|
| Agencies reporting | Number | 5,208 | 6,114 | 5,914 | 5,222 |
| Population represented | Mil | 142 | 151 | 145 | 124 |
| Persons arrested | 1,000 | 6,257 | 6,707 | 6,248 | 5,853 |
| White | 1,000 | 4,373 | 4,664 | 4,459 | 4,112 |
| Percent of Total | Percent | 69.9 | 69.5 | 71.4 | 70.3 |
| Black | 1,000 | 1,688 | 1,484 | 1,636 | 1,562 |
| Other | 1,000 | 196 | 195 | 153 | 179 |
|  |  | 1975 | 1976 | 1977 | 1978 |
| Agencies reporting | Number | 7,993 | 10,058 | 10,864 | 11,852 |
| Population represented | Mil | 169 | 173 | 197 | 207 |
| Persons arrested | 1,000 | 7,671 | 7,384 | 8,972 | 9,688 |
| White | 1,000 | 5,539 | 5,337 | 6,429 | 6,793 |
| Percent of Total | Percent | 72.2 | 72.3 | 71.7 | 70.1 |
| Black | 1,000 | 1,935 | 1,870 | 2,308 | 2,562 |
| Other | 1,000 | 197 | 177 | 235 | 333 |

*See* PX 14, Statistical Abstract of the United States, 1980 Table No. 320, Persons Arrested—Race, Sex and Age: 1970 to 1979 (footnote omitted). This table includes persons arrested for both felonies and misdemeanors.

4. Percentage of Felony Arrests, By Race in New York City for 1971:

| Whites | Blacks | Hispanics |
|--------|--------|-----------|
| 24 | 53 | 23 |

*See* PX 14, *A Criminal Justice System Under Stress*, Vera Institute of Justice, August 15, 1975, Table 5–3 at 53.[17]

5. Percentage of Felony Convictions, By Race for 1978:

| | New York State | New York City |
|--------|--------------|---------------|
| White | 45.8 | 39.7 |
| Black | 48.0 | 52.8 |
| Other | 6.2 | 7.5 |

*See* PX 14, New York State Criminal Justice Processing, *Felony Offenders Disposed* in 1978, An OBTS Report, March 1, 1981, Table 3 and Figure 9.

6. Percentage of Incarcerated Population, By Race:

| | State Prisons in United States 1974 | New York State 1970 | 1971 | New York City 1978* |
|--------|-------------|------|------|-------------|
| White | 51 | 33 | 31 | 15.2 |
| Black | 47 | 53.5 | 55 | 57.7 |
| Other | 2 | 13.5 | 13 | 25.5 |
| | | | 1 (not available for study) | |

*Approximate percentages and includes pre-trial detainee population.

*See* PX 14, *Characteristics of Inmates Under Custody, 1970*, The New York State Department of Correctional Services, Division of Program Planning and Evaluation, Table 11b at 5; *State of New York Department of Correctional Services Division of Research Selected Statistical Table for the Year 1971 and the Movement of Population for the Year 1972*, New York State Department of Correctional Services Division of Program Planning and Evaluation, Table 6; Report to William Ciuros, Jr., Commissioner of New York City Department of Correction, In Response to the National Council on Crime and Delinquency Report on "The Cost of Incarceration in New York City," As Presented to the Public Safety Committee of the City Council of New York, March 7, 1978.[18] Plaintiff failed to submit any

17. Although not reflected in PX 14, the parties have stipulated the data from the Vera Institute study concerns felony arrests by race in New York City for the year 1971.

18. In addition, plaintiff submitted a statistical summary supported by the affidavit of his counsel. *See* PX 16 and 17, marked for identification. The summary contains charts based on the various statistics contained in PX 14 and information given to plaintiff's counsel in two telephone conversations. In the first conversation, plaintiff's counsel received general population figures by race for the United States, New York State and New York City for 1970 and 1980 from an unidentified person at the office of the United States Census Bureau Data User Services, 26 Federal Plaza, New York, New York. In the second conversation, plaintiff's counsel received the racial breakdown of inmates under the custody of the New York State Department of Correctional Services at the close of each calendar year from 1972 to 1980 from Hank Donnelly, Director of the Division of Records and Statistical Analysis, New York State Department of Correctional Services, State Office Building Campus, Albany, New York. Thereafter, Mr. Donnelly, by letter dated May 4, 1981, forwarded plaintiff's coun-

statistical evidence on the racial composition of (1) applicants to the Postal Service, (2) employees of the Postal Service, or (3) applicants who have been rejected by the Postal Service because of prior criminal convictions.

## DISCUSSION

### Title VII Claims

Section 717 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, requires that "[a]ll personnel actions affecting employees ... in the United States Postal Service ... shall be made free from any discrimination based on race, color, religion, sex or national origin." The standards applicable to section 717 claims are found in 42 U.S.C. § 2000e–2(a), which provides in pertinent part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

Section 717, which extended the remedies of Title VII to federal employees, became effective March 24, 1972.[19] Defendants argue that plaintiff is barred from litigating claims arising from his 1970 denial of reinstatement and March 20, 1972 denial of employment because section 717 cannot be applied retroactively to those claims.[20]

■ It is now well-settled that section 717 applies retroactively to actions in which an administrative or judicial claim was pending on March 24, 1972 but not if such

---

sel an uncertified copy of a table derived from the above statistics which was offered for admission into evidence.

The Court declines to receive into evidence the summary, the affidavit, or Donnelly's statistical table. To the extent that plaintiff seeks to rely upon telephone conversations, such information is plainly inadmissible hearsay. In addition, although the statistical table forwarded to plaintiff by Donnelly may fall within the public records and reports exception to the hearsay rule, see Fed.R.Evid. 803(8), that document in its present form is not authenticated under either Fed.R.Evid. 901 or 902 and thus is inadmissible. The only other information contained in the summary is based on statistics contained in PX 14 and therefore is repetitious.

**19.** Although discrimination in federal employment was prohibited pursuant to executive orders prior to the extension of Title VII remedies to federal employees, the ability of such employees to obtain relief in administrative or judicial proceedings was far from certain. See Brown v. General Servs. Administration, 507 F.2d 1300, 1304 (2d Cir. 1974), aff'd, 425 U.S. 820, 825–28, 96 S.Ct. 1961, 1964–65, 48 L.Ed.2d 402 (1976).

**20.** Alternatively, defendants contend that these claims are barred because plaintiff did not file a timely administrative complaint as required by the Civil Service regulations then in effect. In 1970, federal employees were required to file administrative claims within 15 days of the alleged discrimination. 5 C.F.R. § 713.-214(a)(i), (ii) (1970). This requirement was changed from 15 to 30 days as part of an overall revision of 5 C.F.R. Part 713 promulgat-

ed on October 21, 1972. See Ettinger v. Johnson, 556 F.2d 692, 693 n.3 (3d Cir. 1977). Plaintiff relies on portions of those regulations that provide that an extension of such limits will be granted when a complainant shows that he was not notified of the time limits or was not otherwise aware of them. 5 C.F.R. § 713.-214(a)(2) (1970). These substantive provisions are now codified at 29 C.F.R. § 1613.214(a)(4) (1980). Plaintiff contends that since the Postal Service processed his claim in 1976 without raising the timeliness issue, the Court should consider his administrative claim to be timely.

The evidence adduced at trial indicates that during the relevant time period applicants were not notified of their right to file an administrative complaint or the time limits in which to do so unless they telephoned the personnel office to question the denial of employment. See note 10 supra. Plaintiff testified that he did not know of the time limits and defendants produced no evidence that he knew or should have known of the requirements of the Civil Service regulations. Therefore, although not convinced that the Postal Service waived the regulation's requirements by considering plaintiff's administrative complaint, see Scott v. Claytor, 469 F.Supp. 22, 24–25 (D.D.C.1978); DeMedina v. Reinhardt, 444 F.Supp. 573, 576–79 (D.D.C. 1978), the Court concludes that plaintiff is entitled to an extension of the time limits and that his 1970 and 1972 claims are not barred by these regulations because he had no knowledge of this time limit requirement. See Ettinger v. Johnson, supra, 556 F.2d at 698; Myles v. Schlesinger, 436 F.Supp. 8, 16–18 (E.D.Pa. 1977).

claims had been finally decided or abandoned by that date. *See Revis v. Laird,* 627 F.2d 982 (9th Cir. 1980); *Brown v. General Services Administration,* 507 F.2d 1300, 1304–06 (2d Cir. 1974), *aff'd,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Henderson v. Defense Contract Administration Services Region, New York,* 370 F.Supp. 180 (S.D.N.Y.1973).[21] Defendants argue that since plaintiff did not file his administrative complaint challenging the 1970 and 1972 employment decisions until January 31, 1976, section 717 cannot be applied retroactively. Plaintiff responds that section 717 should nonetheless be applied retroactively to actions challenging pre-March 24, 1972 discrimination when no administrative claim was yet pending on that date, relying upon *Huntley v. Department of Health, Education and Welfare,* 550 F.2d 290 (5th Cir. 1977), and *Laurel v. United States,* 547 F.2d 917 (5th Cir. 1977). *See also Carreathers v. Alexander,* 587 F.2d 1046, 1050–51 (10th Cir. 1978). Judge Tuttle stated in *Huntley*:

> We perceive no distinction between those cases in which the illegal conduct had occurred prior to the enactment of the 1972 amendment where there was already pending a claim based upon such conduct and a case like the one we are concerned with, where the claim had not yet been filed.

550 F.2d 295–96.

In *Brown v. Turner,* 490 F.Supp. 939 (D.D.C.1980), however, where plaintiff alleged that the act of discrimination occurred on April 5, 1971 but did not file his informal complaint of discrimination until February 23, 1976, the court declined to follow the reasoning of *Huntley,* absent allegations of a continuing violation. In the present case, plaintiff's administrative

claims both allege a continuing discriminatory practice. Therefore, plaintiff argues that the continuing nature of the violation permits the Court to consider both pre- and post-amendment acts of discrimination regardless of the pendency of an administrative claim on March 24, 1972. *See Bethel v. Jeffers,* 589 F.2d 631, 636–37 (D.C.Cir.1978); *Ettinger v. Johnson,* 518 F.2d 648, 651 n.7a (3d Cir. 1975); *Fleischhaker v. Adams,* 481 F.Supp. 285, 287 (D.D.C.1979); *Chewning v. Schlesinger,* 471 F.Supp. 767, 772–75 (D.D.C.1979).

■ It is clear that a continuing violation permits the consideration of acts of discrimination that occurred prior to the relevant limitations periods when plaintiff alleges at least one "fresh" act of discrimination—one which occurred within the relevant limitations period—that is part of the continuing discriminatory pattern or policy. *See Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 274–75 (2d Cir. 1981); *Marin v. New York State Department of Labor & Manpower Services Division,* 26 E.P.D. ¶ 31,850, 512 F.Supp. 353 (S.D.N.Y. Apr. 24, 1981). Although, to the Court's knowledge, section 717 has never been applied retroactively in this Circuit to claims when no administrative or judicial action was pending on March 24, 1972 based upon allegations of a continuing violation, the Court would be inclined to do so given the remedial nature of section 717. *See Brown v. General Services Administration, supra.* Upon consideration of the merits of plaintiff's claims, however, the Court concludes that plaintiff has failed to prove a discreet violation of Title VII much less the continuing violation he has alleged.[22]

---

21. In *Brown,* the Second Circuit concluded that section 717 did not create new substantive rights, but rather provided a new remedy for enforcing existing rights. 507 F.2d at 1305. The Court relied upon the common law principle that such remedial statutes are generally applicable to pending cases when it approved the retroactive application of section 717 to pending claims. That common law principle does not support retroactivity in the instant case, however.

22. Plaintiff's claim of a continuing violation is based upon allegations that from at least 1970 until the entry of the Consent Order in this case, defendants maintained a policy or practice of automatically excluding from employment persons who had been convicted of felonies or a serious or unusual number of misdemeanors without consideration of the conviction's effect on the individual's fitness to serve as a Postal Service employee. Plaintiff con-

Plaintiff alleges that the Postal Service's former policy governing the employment of persons with criminal records as contained in the Handbook automatically and invariably caused the exclusion of persons convicted of a felony or a serious or unusual number of misdemeanors without consideration of their qualifications or the job-related nature of the conviction. He further alleges that this policy was the sole cause of defendants' decision not to employ him in 1970, 1972 and 1976. Plaintiff attacks defendants' policies as discriminatory in both treatment and impact in violation of Title VII.

As the Supreme Court stated in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 1854–1855 n.15, 52 L.Ed.2d 396 (1977) [*"Teamsters"*], discriminatory or disparate treatment occurs when "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." Disparate impact, on the other hand, results from the use of "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* 431 U.S. at 336 n.15, 97 S.Ct. at 1855 n.15. Proof of motive is not required to sustain a claim of disparate impact. The Court will first address plaintiff's discriminatory treatment claim.

*Discriminatory Treatment*

■ A prima facie case of discriminatory treatment is established by plaintiff's showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek

---

tends that he was denied employment on three occasions because of this policy which allegedly throughout this period had a disproportionate impact upon minorities.

The Second Circuit has recently discussed the concept of a continuing violation:

As a general matter, the mere continuation of a discriminatory act's effects, when the act itself occurred prior to the pertinent limitations period, is not sufficient to support recovery under Title VII. *United Air Lines, Inc. v. Evans, supra,* 431 U.S. [553] at 558, 97 S.Ct. [1885] at 1889 [52 L.Ed.2d 571]. *See also Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). The act that constitutes the violation must be "still fresh" within the statutory period. . . .

Where, however, the defendant has engaged in a continuous policy of discrimination, acts in furtherance of that policy are not viewed in isolation. In such circumstances if the charge has been filed no later than 300 days after the *last* act by the defendant pursuant to its policy, the plaintiff may recover for earlier acts of discrimination as well. In *Acha v. Beame* [570 F.2d 57 (2d Cir. 1978)], we stated this principle as follows:

To succeed at trial, the appellants must be able to demonstrate a Title VII violation occurring after the effective date of the Act and within the period of the statute of limitations, or 300 day charge-filing period. But such a

violation is not limited to hiring violations per se.

A continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the *last occurrence* of an instance of that policy. . . . Furthermore, where an illegal policy is so maintained, relief for injuries sustained even before the beginning of the limitations period is appropriate.

570 F.2d at 65 (emphasis in original; citations omitted).

*Association Against Discrimination in Employment, Inc. v. City of Bridgeport, supra,* 647 F.2d at 274 (citations omitted). Of course, in the context of a section 717 claim such as the present one, the statute of limitations is shorter, *see* note 20 *supra,* and there is no dispute that plaintiff filed a timely administrative claim challenging the denial of employment at the Jamaica Post Office, the "last occurrence" of which he complains. Therefore, since plaintiff alleges a continuously maintained discriminatory policy and a timely act of discrimination that was a result of that policy, he has succeeded in alleging a continuing violation. *See Scott v. Claytor, supra,* 469 F.Supp. at 25; *Myles v. Schlesinger, supra,* 436 F.Supp. at 14–15. *But see DeMedina v. Reinhardt, supra,* 444 F.Supp. at 576–77. As noted above, however, plaintiff did not sustain his burden of proof with respect to the above allegations.

applications from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted). The burden then shifts to defendants to produce evidence that plaintiff was rejected for a legitimate, nondiscriminatory reason. However, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (U.S. 1981). If defendants carry their burden of production, the presumption of discrimination raised by the prima facie case is rebutted and plaintiff is given the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. *Id.* Throughout plaintiff has the ultimate burden of persuasion that he was the victim of intentional discrimination.

■ Even if the Court assumes that plaintiff was qualified for the positions he applied for because he passed the necessary competitive examinations, which the Court believes is doubtful in view of his poor prior Postal Service record, defendant has successfully rebutted the presumption of discrimination through the production of evidence that plaintiff's poor service record was the actual reason for his rejection. Plaintiff has not demonstrated that this proffered reason is a mere pretext for the alleged discriminatory actions. Although in his post-trial memorandum of law plaintiff argues that he was a victim of discriminatory treatment, at trial he testified that his claim rested solely upon the alleged disparate impact of defendants' policy regarding the employment of persons with criminal convictions upon minority applicants. Tr. at 61–62. There is no indication in the record that the challenged policy was adopted with a discriminatory motive and the Court finds that it was not. Moreover, the Court finds that at no time did any Postal Service employee act with a discriminatory motive in reviewing and denying plaintiff's applications. Therefore, the Court concludes that plaintiff has not sustained his burden of proof that he was the victim of discriminatory treatment in the defendants' denial of employment in 1970, 1972 and 1976.

*Disparate Impact*

■ A prima facie case of disparate impact may be established by showing that an employer's facially neutral practice has a disparate impact upon members of plaintiff's racial group. *Griggs v. Duke Power Co.,* 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158 (1970).

Such a discriminatory impact is frequently evidenced by statistics from which it may be inferred that an employer's selection methods or employment criteria result in employment of a larger share of one group [(non-minorities)] than of another [(minorities)]. *Intl. Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n.15, 339 [97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396] (1977); *Hazelwood School Dist. v. United States,* 433 U.S. 299 [97 S.Ct. 2736, 53 L.Ed.2d 768] (1977). The employer may defend by showing that the employment practice is justified by business necessity or need and is related to successful performance of the job for which the practice is used, *Griggs v. Duke Power Co., supra,* 401 U.S. at 424, 432 [91 S.Ct. 849, 852]. In that event the plaintiff must be given an opportunity to show that other selection methods having less discriminatory effects would serve the employer's legitimate interest in competent performance of the job. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425 [95 S.Ct. 2362, 2375, 45 L.Ed.2d 280] (1975); *Dothard v. Rawlinson,* 433 U.S. 321, 329 [97 S.Ct. 2720, 2726, 53 L.Ed.2d 786] (1977); *United States v. Bethlehem Steel Corp.,* 446 F.2d 652, 662 (2d Cir. 1971).

*Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir. 1980).

In the present case, defendants contend that plaintiff has failed to establish a prima facie case by a fair preponderance of the credible evidence for three reasons. *First,* defendants argue that unlike cases relied upon by plaintiff, *see, e. g., Green v. Mis-*

*souri Pacific Railroad Co.*, 523 F.2d 1290 (8th Cir. 1975); *Gregory v. Litton Systems, Inc.*, 316 F.Supp. 401 (C.D.Cal.1970), *aff'd*, 472 F.2d 631 (9th Cir. 1972), defendants never maintained a blanket policy that disqualified persons with criminal convictions from employment. Rather, they claim that the policy contained in the Handbook and its revisions from 1971 through 1979 called for the review of all available information concerning the applicant to assess his qualifications, including his prior employment records, military service records, and convictions, if any. When a felony or series of misdemeanor convictions appeared on an application, the Handbook provided that the applicant "should normally be removed from the register," although the installation head could submit the application file to the Regional Director of Employee Relations with reasons for recommending the appointment.

From the evidence adduced at trial, it is unclear how many applicants with a felony or a number of misdemeanor convictions were recommended for appointment since plaintiff submitted no statistical evidence on this point. It is clear that arrests, rather than convictions, were not considered. The June 22, 1977 letter from the Acting Manager of the EEO Branch of the Northeastern Region in regard to plaintiff's 1970 and 1972 claims of discrimination states that six motor vehicle service employees, four black and two white, were removed because of penal sentences and their applications for reinstatement denied after individual consideration was given to their requests. These figures, however, do not appear to be statistically significant in terms of overall experience under the policy. *See* PX 4. Covino and Chiarella, however, were under the impression that the Postal Service policy generally prohibited the employment of convicted felons although it also appears that both of these individuals were lower level personnel clerks who would not make the final decision on such matters under the review procedure described by Henderson. But Henderson, who was such a decision-making official, has no recollection of ever recommending a convicted felon for appointment.

Balanced against this evidence, Eichenholtz testified that although an applicant's conviction was always a factor considered in determining his suitability under Postal Service procedures, that factor was not considered in isolation but in the context of the applicant's overall qualifications and employment record. Moreover, he testified that he had recommended convicted felons for appointment. This testimony, together with the fact that plaintiff himself was hired at the Hicksville Post Office in 1976, severely undercuts his claim that the Postal Service maintained an unwaivering policy that disqualified persons convicted of a felony or a serious or unusual number of misdemeanors.[23] Based upon the present records, the Court concludes that persons with such conviction records were more often rejected than not. Plaintiff, however, has not proved by a fair preponderance of the credible evidence that defendants' former policy *automatically* disqualified persons convicted of felonies or serious misdemeanors. *See Cross v. United States Postal Service*, 483 F.Supp. 1050 (E.D.Mo.1979).

*Second*, defendants argue that even if plaintiff had established that defendants' policy always disqualified persons with criminal records, his statistical evidence is totally insufficient to establish a prima facie disparate impact case. In particular, defendants rely upon *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), and *New York Transit Authority v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), in pointing to plaintiff's failure to adduce comparative statistics concerning actual ap-

---

**23.** Therefore, the present case is distinguishable from *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), and *Green v. Missouri Pac. R. R. Co., supra.* In those actions, the courts found insignificant the occasional waiver of the challenged employment practices since they found that such waivers were aberrations that did not defeat plaintiffs' disparate impact claims. Moreover, the refusals to hire were admittedly caused by the challenged policies in those cases.

plicants for Postal Service positions who were denied employment because of criminal convictions.

The Court agrees that plaintiff's statistical evidence leaves much to be desired. Plaintiff has not defined the relevant geographic area from which applicants could be expected to be drawn. There are references throughout the record to the "Northeast Region" of the Postal Service. The Court assumes that such a regional area is the relevant area, but there is no indication as to the localities that are included in the Northeast Region. Moreover, a portion of the general population statistics relied upon by plaintiff focuses on arrests, some of which include both felony and misdemeanor charges, rather than on felony or serious misdemeanor convictions. The record indicates, however, that arrests were not considered at all by the Postal Service.

Finally, although the Court indicated at trial that it was primarily interested in statistical evidence for the year 1976, plaintiff was given an opportunity to submit statistical evidence for other years. Having carefully examined all of plaintiff's statistical evidence in connection with his claim of a continuing violation and as relevant background evidence for his 1976 claim, the Court finds that there are a number of gaps both in terms of geographic area and time periods for percentages of minority convictions for felonies and serious misdemeanors.[24]

The Supreme Court has noted that "statistics . . . come in infinite variety . . . . [T]heir usefulness depends on all of the surrounding facts and circumstances." *Teamsters, supra,* 431 U.S. at 340, 97 S.Ct. at 1856–57. The Court further recognizes that "[t]here is no requirement . . . that a

statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants." *Dothard v. Rawlinson, supra,* 433 U.S. at 330, 97 S.Ct. at 2727. Moreover, plaintiff is "not required to exhaust every possible source of evidence, if the evidence actually presented on its face conspicuously demonstrates a job requirement's grossly discriminatory impact." *Id.* at 331, 97 S.Ct. at 2727. When special qualifications are required for particular jobs, however, comparisons of the general population, rather than the group of qualified individuals, possesses less probative value. *Hazelwood School District v. United States, supra,* 433 U.S. at 308 n.13, 97 S.Ct. at 2742 n.13.

The difficulty with plaintiff's statistical evidence in establishing a prima facie case that defendant's policy concerning the employment of persons with criminal records has a disproportionate impact on minorities, is that it assumes that all convicted felons apply to the Postal Service, pass the necessary competitive examination and then are rejected because of their criminal record. But there is no evidence in the record that discloses the proportion of convicted persons, either black or white, who could successfully complete the Postal Service examination. Under Postal Service procedures, an applicant's conviction record would only be considered after he or she passed the examination and received a pre-employment interview. Despite plaintiff's argument that the positions he applied for did not require special qualifications, passing the competitive examination was a threshold requirement. Therefore, just as general population statistics are less probative where a position requires special qualifications, they are also less probative where an applicant must successfully complete a com-

---

24. The only felony conviction statistics presented by plaintiff are for 1978—two years after the last discriminatory act he alleges. Although the Court has considered this evidence, it finds evidence concerning post-1976 events to be of much less probative value than statistics for the period of the alleged continuing violation. Moreover, the Court notes that even

the statistics contained in plaintiff's statistical summary, PX 16 for identification, which the Court ruled was inadmissible, *see* note 18 *supra,* would be of little help in bolstering the overall weakness of plaintiff's conviction statistics for the relevant geographic area during the period in question.

petitive examination before the challenged policy is applied to him.[25]

The probative value of plaintiff's statistical evidence is further undercut by the Court's finding that defendant's policy was not consistently applied to disqualify applicants with conviction records. Thus, even if the Court overlooks the obvious geographical and time gaps in the general population statistics and assumes that plaintiff's statistical evidence supports the general proposition that minorities are convicted of felonies and serious misdemeanors at a higher rate than their proportion of the general population during the time periods of the alleged violations, the Court finds that the statistical evidence is not sufficient to establish a prima facie case that defendants' policy had a disparate impact upon minorities.

Moreover, even if plaintiff had established such a prima facie case, defendants have submitted substantial evidence that, regardless of his prior conviction, plaintiff would not have been hired because of his prior poor employment record with the Postal Service. Although such questions of causation usually arise in the context of disparate treatment claims where the employer's discriminatory motive is critical, the Court believes that it is plaintiff's burden to prove by a fair preponderance of the credible evidence that the employment practice or policy that is challenged as having a disparate impact on a protected class was a determinative factor in the employment decision affecting plaintiff. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282 n.10, 96 S.Ct. 2574, 2580 n.10, 49 L.Ed.2d 493 (1976); *Fisher v. Flynn*, 598 F.2d 663, 665 (1st Cir. 1979). In the context of an age discrimination action,

the Second Circuit Court of Appeals has recently stated that:

> Where an employer acts out of mixed motives in discharging or refusing to hire an employee, the plaintiff must show that [the impermissible consideration] was a causative or determinative factor, one that made a difference in deciding where the plaintiff should be employed.

*Geller v. Markham, supra*, 635 F.2d at 1035; *see Bentley v. Stromberg-Carlson Corp.*, 638 F.2d 9, 11–12 (2d Cir. 1981); *Smithers v. Bailar*, 629 F.2d 892, 897–98 (3d Cir. 1980); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979); *Laugeson v. Anaconda Co.*, 510 F.2d 307, 317 (6th Cir. 1975). Thus, while plaintiff need not prove that his conviction was the sole consideration in defendants' decisions not to hire him, he must prove that his fortunes would have been different but for that factor. *Geller v. Markham, supra*, 635 F.2d at 1035.

The evidence adduced at trial clearly indicates that plaintiff's conviction was a factor that was considered on each of the three occasions plaintiff applied for a position with the Postal Service. The Court finds, however, that plaintiff's conviction was not a determinative factor in each of those decisions. The regulations contained in the Handbook provided that a prior unsatisfactory work history was as much a ground for disqualification as a criminal conviction. Moreover, the testimony at trial revealed that an applicant's prior Postal Service work history was routinely considered before any decisions were made concerning his application. Thus, it was plaintiff's prior Postal Service record, and not his conviction, that was the ground communicated to him for the 1970 denial of his request for reinstatement.

*See Green v. Missouri Pac. R.R. Co., supra*, 523 F.2d at 1294. Although the Court realizes that a racially balanced work force cannot immunize an employer from liability where its specific policies or practices violate Title VII, *see Teal v. State of Connecticut*, 645 F.2d 133, 139 (2d Cir. 1981), evidence that the employer's work force is racially imbalanced is nonetheless probative, especially when plaintiff's general population statistical evidence is weak.

---

**25.** The Court also notes that in the cases upon which plaintiff relies in defending the sufficiency of his general population statistics, the courts, in addition to such general population statistics, considered statistics of the racial composition of the employer's work force, *see Dothard v. Rawlinson, supra*, 433 U.S. at 327, 97 S.Ct. at 2725–24, or other statistical evidence that supported an inference that the challenged practice or policy resulted in a disproportionate impact upon the protected class.

Moreover, the Court does not find determinative of the causation issue with regard to the 1972 and 1976 denials of employment the 1972 GPO index card file of applicants with derogatory information, which lists plaintiff's conviction, or the fact that in 1976 Chiarella told plaintiff that the Postal Service's policy prohibited hiring an individual with a criminal record. The record indicates that on both occasions the Postal Service followed the application procedures contained in the Handbook and described in Henderson's testimony. *See* PX 7 at 2. Therefore, an employment assistant or supervisor, rather than a clerk like Chiarella, made the final decision on plaintiff's applications. Although not direct evidence of the mental processes of the employment assistants at the time of the decisions, the Court credits Eichennholtz's testimony that under normal procedures plaintiff's prior service record would be assessed. This record was so poor that he would not have been appointed regardless of his conviction. Accordingly, the Court finds that plaintiff's conviction was not a determinative factor in any of the decisions denying him employment.

*Due Process Claim*

Plaintiff contends that defendants' policy regarding the employment of persons with criminal records automatically disqualified those applicants on the assumption that a conviction renders an applicant unfit for employment in the Postal Service. He argues that such a policy is not rationally related to a legitimate governmental interest. *See Smith v. Fussenich*, 440 F.Supp. 1077 (D.Conn.1977) (three-judge panel). Defendants, on the other hand, argue that plaintiff's due process claim is barred because Title VII is the exclusive remedy for federal employees complaining of employment discrimination. *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).

Although the Court does not agree with defendants that plaintiff's due process challenge to the rationality of defendant's policy is precluded by the rationale of *Brown v. General Services Administration,*

*supra,* the Court finds that plaintiff has not proven that defendants' policy for the employment of persons with criminal records, either as contained in the Handbook or as applied, automatically disqualified such applicants without consideration of the conviction's effect on their fitness for employment with the Postal Service. *See* pp. 1300–1301 *supra.* Accordingly, plaintiff has not sustained his burden of proof that defendants' policy was overbroad and thus not rationally related to a legitimate governmental purpose.

## CONCLUSION

In accordance with the foregoing, after a trial on the merits of plaintiff's amended complaint, the Court finds for the defendants. The Clerk of the Court is directed to prepare and enter Judgment dismissing the amended complaint.

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

SO ORDERED.