Claire CHERRY, Plaintiff,

v.

AMOCO OIL COMPANY, Defendant.

Civ. A. No. C78–754A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Nov. 27, 1979.

Robert L. Schwind of Levine & Meltz, Atlanta, Ga., for plaintiff.

Judson Graves and Earle B. May, Jr., of Jones, Bird & Howell, Atlanta, Ga., for defendant.

## ORDER

EVANS, District Judge.

This is an action brought under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, and Regulation B of the Board of Governors of the Federal Reserve System, 12 CFR 202, in which Plaintiff Cherry seeks damages for alleged violations of the Act arising from Defendant Amoco's rejection of Plaintiff's application for a gasoline credit card. This action is presently before the Court on Defendant's Motion to Dismiss and Motion for Summary Judgment. Both parties have submitted briefs on these motions and have also complied with Local Court Rule 91.72 by filing separate statements of material facts as to which there is no genuine issue to be tried. The United States of America has been allowed to file

as *Amicus Curiae* with a brief opposing the present motions to dismiss and for summary judgment.

Plaintiff Cherry filed this complaint on April 26, 1978. Based on the original complaint and later submissions by the Plaintiff in this case, Cherry's basic allegation is two-fold: she claims that the Defendant denied her credit on the basis of a racially discriminatory factor which is in violation of 15 U.S.C. § 1691(a)(1), and also that she was denied credit for reasons which were false, misleading, or not stated with the specificity required by 12 CFR 202.9(b)(2). Cherry's claim of racial discrimination is based on Amoco's "credit experience in the [Plaintiff's] immediate geographical area" which was given by Defendant as one of three factors determining the rejection of Cherry's application. The "immediate geographical area" is determined by the applicant's zip code and Cherry, a white woman, argues that such a factor is the equivalent of racial discrimination due to the segregated pattern of housing in the Atlanta area. As to her other claim, Cherry argues that the other two factors given by Amoco in rejecting her application, "level of income" and "type of bank references", are false, misleading, or not stated with specificity as required by law.

◾ Defendant Amoco's Motion to Dismiss is based on Amoco's argument that Plaintiff Cherry lacks standing to litigate this claim and that the complaint itself fails to state a claim upon which relief can be granted. In order to properly evaluate these contentions by the Defendant, the relevant provisions of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, must be discussed. Section 1691(a)(1) reads as follows:

(a) It shall be unlawful for any creditor to discriminate against *any* applicant, with respect to *any* aspect of a credit transaction—

(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract). (emphasis added)

Section 1691(d)(2) reads as follows:

(2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—

(A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained . . .

Section 1691(d)(3) then says "A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken." The Act gives no further explanation of what is required as to specificity, but Regulation B of the Board of Governors of the Federal Reserve System makes mention of it in 12 CFR § 202.9(b)(2), which says:

A statement of reasons for adverse action shall be sufficient if it is specific and indicates the principal reason(s) for the adverse action. A creditor may formulate its own statement of reasons in checklist or letter form or may use all or a portion of the sample form printed below, which, if properly completed, satisfies the requirements of paragraph (a)(2)(i) of this section.

The sample form mentioned above contains a checklist of nineteen "principal reasons for adverse action concerning credit" as well as a blank space for "other specify". One of the reasons on the checklist is "insufficient income", which is similar to but not the same as "level of income" given as one of Amoco's principal reasons in rejecting Cherry's application. Amoco's other two reasons, "type of bank references" and "our credit experience in your immediate

geographical area", are not included among the nineteen reasons on the sample form. However, 12 CFR 202.9(b)(2) does not indicate that the sample form is meant to include all valid reasons but merely serves as examples of "specific" valid reasons.

 Having reviewed the record in this case, the Court finds that the two primary claims arising from Plaintiff Cherry's complaint do state claims upon which relief may be granted under the provisions of the Equal Credit Opportunity Act as stated above. Section 1691(a)(1) prohibits racial discrimination in any aspect of a credit transaction. Cherry alleges that Amoco's rejection factor of "our credit experience in your immediate geographical area" involves racial discrimination when it is applied to an area with a racially segregated housing pattern and therefore such a rejection factor is in violation of § 1691(a)(1). Section 1691(d)(3) requires that a creditor give specific reasons for rejecting a credit application and Cherry alleges that the factors of "level of income" and "type of bank references" are false, misleading, and lack specificity in violation of § 1691(d)(3). Under § 1691e(a), civil liability arises as follows:

Any creditor who fails to comply with any requirement imposed under this title [15 U.S.C. § 1691 et seq.] shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.

Cherry's claims that the rejection factors used by Amoco in this case are in violation of §§ 1691(a)(1) and 1691(d)(3) do state a claim for which relief may be granted under § 1691e(a) and therefore no dismissal will be granted on the basis of failure to state a claim.

Defendant Amoco's Motion to Dismiss is really based on its argument that Plaintiff Cherry lacks standing to litigate a claim of racial discrimination because Cherry is not a member of the race which she alleges is discriminated against by Amoco's use of "our credit experience in your immediate geographical area" as a determinative factor in rejecting credit applications. The

Court recognizes that the issue of Cherry's standing to claim racial discrimination in violation of the Equal Credit Opportunity Act presents a question of first impression. Although cases involving issues of standing under other circumstances may offer assistance in determining this matter, the Court must ultimately look to the Act itself and any relevant legislative history to decide whether the Plaintiff in this case has standing. In order to best analyze this standing question the Court will start with a general view and then move to an investigation of the Act itself.

 The most recent Supreme Court case to deal with a question of standing was *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). In footnote 18, the Court said:

. . . standing is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Article III case or controversy, or at least to overcome prudential limitations on federal court jurisdictions, see *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 2197 (1975) . . . And under the criteria we have set out, petitioner clearly has standing to bring this suit. If the allegations of her complaint are taken to be true, she has shown that she "personally has suffered some actual or threatened injury as a result of a putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). (at 107, n.18, 99 S.Ct. at 2274, n.18, 60 L.Ed.2d at 859, n.18)

The Court dealt with standing in a more direct manner in *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). Under *Gladstone,* standing is first viewed under the test of Article III of the Constitution:

The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between himself and the defendant. (441 U.S. at 99, 99 S.Ct. at 1608, 60 L.Ed.2d at 76)

If Article III is satisfied, then the "prudential limitations" test is applied, as described in *Gladstone* as follows:

> Even when a case falls within these constitutional boundaries, a plaintiff may still lack standing under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim . . .
>
> He also must assert his own legal interests rather than those of third parties. (cites omitted) (441 U.S. 99–100, 99 S.Ct. 1608, 60 L.Ed.2d 77)

However, the Court in *Gladstone* indicated that Congress can provide for broad standing if still within the Article III limitations:

> Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one who otherwise would be barred by the prudential standing rules. (cite omitted) In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered a distinct and palpable injury to himself (cite omitted). (441 U.S. 100, 99 S.Ct. 1608, 60 L.Ed.2d 77)

In *Gladstone*, the Court held that § 812 of the Fair Housing Act, 42 U.S.C. § 3612, allowed standing to sue as broad as is permitted by Article III, and therefore individual residents of the "target" area, many of them white, could challenge the sales practices of defendant brokerage firms involving "steering" blacks toward and whites away from the "target" area on the basis of allegations that such a practice destroyed the integrated character of the "target" area.

In considering the standing of Cherry to sue under the Equal Credit Opportunity Act in light of the general requirements outlined in *Gladstone*, this Court must accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 2197 (1975). Accepting the truth of Cherry's allegation that the rejection factor of "our credit experience in your immediate geographical area" used by Amoco is racially discriminatory, the question before this Court is whether Cherry has standing to sue in this case based on such a claim. Under § 1691(a)(1), it is unlawful for a creditor to discriminate against "any" applicant "on the basis of race". The statutory language does not say on the basis of "that applicant's" race or "his or her" race. Where a creditor fails to comply with the prohibition against racial discrimination, the creditor is liable to the "aggrieved" applicant in a private action under § 1691e(a). Therefore the language of the statute itself suggests that the Act is meant to prevent racially discriminatory behavior on the part of creditors in their credit transactions and that when such behavior exists the statute will protect anyone affected or aggrieved by that discriminatory behavior.

The focus of the statutory language on creditors' liability for the effects of racial discrimination is also reflected in the legislative history of the 1976 amendments to the Act which expanded coverage from discrimination based on sex or marital status to discrimination based on race, religion, national origin, and age as well. The report of the Senate Committee on Banking, Housing and Urban Affairs dealing with these amendments, Senate Report No. 94–589, said in part:

> In determining the existence of discrimination on these grounds, as well as on the other grounds discussed below, courts or agencies are free to look at the effects of a creditor's practices as well as the creditor's motives or conduct in individual transactions. (1976 U.S.Code Cong. & Admin.News, pp. 403, 406)

Under this analysis of the statute, whenever discrimination exists in violation of § 1691(a)(1), then the creditor guilty of such violation is liable to *anyone* adversely affected by such unlawful discrimination. In theory one might suppose that those "adversely affected" will always be members of the group having the particular charac-

teristic upon which the discrimination is based, but in practical terms that is not necessarily so.

Plaintiff Cherry's allegations present a good example of the real or practical application of the Act's prohibition of racial discrimination in credit transactions. Cherry is a resident of a predominantly black zip code area of Atlanta, which purportedly has a racially segregated housing pattern in a relative sense (not complete or full segregation). The plaintiff alleges that the use of the rejection factor "our credit experience in your immediate geographical area" by Amoco allows the defendant to discriminate against blacks by rejecting credit applications from predominantly black neighborhoods in Atlanta. However, by discriminating against blacks in those neighborhoods the rejection factor in question may also have the effect of causing the rejection of credit applications from non-blacks who happen to live in those neighborhoods. This is exactly what Cherry claims happened to her. Her zip code area is predominantly black and scores low on the rejection factor being discussed, and according to Amoco this factor has been weighed in conjunction with two other factors in an inseparable manner that results in the rejection of Cherry's application.

■ Assuming that there exists racial discrimination as alleged by the plaintiff, then she has been directly affected by such discrimination in that it resulted in the rejection of her credit application and she is therefore an "aggrieved applicant" under § 1691e(a) and has standing to sue under the Act itself. By alleging that she has been personally injured by the rejection of her credit application on the basis of an allegedly discriminatory factor used by the defendant, Cherry has made out a case and controversy against Amoco and therefore has standing to sue under Article III of the Constitution. "Prudential limitations" do not prevent Cherry from having standing to sue in this case because she is asserting her own legal interests and the court is not being asked to decide "questions of broad social import where no individual rights would be vindicated." Even if prudential principals suggested a lack of standing in the present case, the use of "any applicant" and "the aggrieved applicant" as the language in the Equal Credit Opportunity Act would allow Cherry to pursue this litigation under the broad standing analysis used in *Gladstone, supra.*

 In light of the foregoing discussion, the Court finds that Plaintiff Cherry has stated a claim upon which relief may be granted and that she has standing to litigate such a claim in this case. Therefore, Defendant Amoco's Motion to Dismiss is hereby DENIED. The Court also finds that there are disputed material facts in this case, especially as to the discriminatory nature of "our credit experience in your immediate geographical area", and therefore Defendant Amoco's Motion for Summary Judgment is hereby DENIED.