**Robert O. CRAGIN, Plaintiff,**

v.

**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION, a Federally Chartered Savings and Loan Association, and Arthur Barnett, Defendants.**

**No. CIV–R–78–159–ECR.**

United States District Court,
D. Nevada.

Aug. 7, 1980.

---

**380**

Durney, Guinan & Brennan by Peter D. Durney, Reno, Nev., *for plaintiff.*

A. D. Jensen, Reno, Nev., for defendants.

### MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge.

This is an action brought under the Equal Credit Opportunity Act ("ECOA" or "Act" herein), 15 U.S.C. §§ 1691 et seq.[1] Jurisdiction is provided by 15 U.S.C. § 1691e(f). The case was tried to the Court on June 12, 1980.

### I

On May 25, 1978, plaintiff Robert Cragin and his wife, Adele (who is not a party to this action), completed a written application for a $2,000 property improvement loan from defendant First Federal Savings and Loan Association ("First Federal"). The application itself was made on a form provided by First Federal and was signed by both Mr. and Mrs. Cragin as joint applicants.

---

1. The ECOA was enacted as Title VII of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601 et seq.

The following day, May 26, Mr. Cragin took the completed application form to the Park Lane branch of First Federal, where defendant Arthur Barnett was employed as Assistant Consumer Loan Manager. It is unclear whether Mr. Cragin spoke with Mr. Barnett on this occasion, but at any rate the application was left at the branch for processing.

The loan to the Cragins was approved by First Federal on May 31. A letter indicating as much was sent to Mr. and Mrs. Cragin by Mr. Barnett the same day. As approved, the loan was to be for the amount the Cragins had requested and was to be unsecured.

Shortly thereafter, Mr. Cragin and Mr. Barnett conferred over the telephone about making arrangements to have the Cragins sign the necessary loan documents, which included a promissory note and various disclosure statements. It was First Federal's practice to require that such documents be signed either before a notary public or in the presence of an officer of First Federal. When Mr. Barnett advised Mr. Cragin of this requirement during the course of their conversation, Mr. Cragin responded that such an arrangement would be extremely inconvenient for his wife; the Cragins then had two small children at home (seven months and two years of age, respectively) and it was not easy for Mrs. Cragin to get away from the house. Mr. Barnett insisted, however, that First Federal's procedure would have to be followed. He further stated that both Mr. and Mrs. Cragin would be required to sign the loan documents because they had applied jointly for the loan; one signature would not be sufficient.

Faced with this stalemate, Mr. Cragin then made what he now argues was an oral application for the loan in his name alone. He told Mr. Barnett, simply: "I want to apply for the loan in my own name." As Mr. Cragin envisioned it, this new loan was to be made on the same terms as the one First Federal had just approved, only it was

to be made to him alone rather than to the couple jointly. Mr. Barnett responded to Mr. Cragin's "application" (referred to herein as "oral request for credit") by stating that Mr. Cragin would have to submit a new application, in writing, in order to be considered for the proposed loan. This Mr. Cragin refused to do.

In his testimony, Mr. Cragin claimed Mr. Barnett thereafter maintained the same position, i. e., that Mrs. Cragin's signature would be required on the loan documents for a new application made in Mr. Cragin's name alone. Even as testified to by Mr. Cragin, however, this claimed requirement is uncertain and vague, and is unsupported by any other evidence.

At some point thereafter—exactly when remains unclear—the Cragins made arrangements for a property improvement loan with the First National Bank of Nevada ("First National"). This loan, which the Cragins ultimately received, was made on the same terms as the loan they had negotiated with First Federal. The only difference between the two loans was that the loan from First National was to cost the Cragins $25 more over the life of the loan in higher interest charges.[2]

The situation at this point, then, was somewhat confused. The Cragins had first made a joint application, in writing, for a $2,000 loan. This application had been approved. Then Mr. Cragin had "applied" for the same loan on his own behalf. Now, having negotiated a loan with another lender, the Cragins had apparently abandoned their efforts to deal with First Federal.

On June 10, 1978, the Cragins wrote a letter to the Federal Home Loan Bank in San Francisco, the agency responsible for regulating federally–chartered savings and loan associations in this region. Although the Cragins' letter is not a part of the record, it is apparent that it complained of what the Cragins saw as a violation of the ECOA by defendants. As a consequence of the Cragins' complaint, an investigation

---

**2.** Because plaintiff later prepaid the loan from First National, his interest cost on that loan was actually somewhat less than $25.

into the matter was evidently begun by the Home Loan Bank.

A few days later, on June 13, defendant Barnett made the notation "customer cancelled–6/13/78–" on the application the Cragins had filed on May 26.

Thereafter, on June 20, Mr. Barnett wrote to Mr. Cragin. His letter stated in part as follows:

"Re: Your letter dated 6/10/78 to the Federal Home Loan Bank

Dear Mr. Cragin:

Thank you for bringing this matter to our attention. Perhaps I was confused in requesting your wife's signature on the approved $2,000.00 home improvement loan request–as both you and she signed the loan application and are both vested on the property to be improved, I was under the impression that both signatures would be required on the home improvement loan also.

However, since the loan is to be made unsecured, we can make the loan, as we had previously approved, but with your signature only."

Mr. Barnett concluded with an invitation to Mr. Cragin to contact him "so we may make arrangements to complete the transaction at your convenience."

That invitation was never accepted, and this action was brought in October, 1978.

## II

In recent years, a number of studies have shown that certain classes of people have experienced considerable difficulty in obtaining credit. This difficulty has resulted, not from the fact that these people are inherently less credit–worthy than others, but from customs in the credit industry which perpetuate traditional stereotypes and biases.

The problems of women in obtaining credit have been particularly well–documented.[3] One such problem has been the practice of routinely requiring a married woman applicant to obtain her husband's signature on the credit application as a prerequisite to the extension of credit. See, e. g., Senate Comm. on Banking, Housing & Urban Affairs, S.Rep. No. 93–278, 93d Cong., 1st Sess. 16–19 (1973).

In order to remedy the discrimination problem, several items of legislation were introduced in Congress during 1973. In recommending passage of the bill which was ultimately to become the ECOA, the Senate Committee on Banking, Housing and Urban Affairs stated:

"The Congressional intent is clear: credit is an ordinary incident of financial transactions in our . . . society; any discrimination in the availability and extension of credit on the basis of sex or marital status is intolerable . . ." *Id.,* at page 20.

The ECOA was signed into law on October 28, 1974, and became effective one year later. The Act directed the Board of Governors of the Federal Reserve System ("Board") to "prescribe regulations to carry out the purposes of this title." 15 U.S.C. § 1691b. This was done in October, 1975, with the promulgation of Regulation B, 12 CFR 202. Thereafter, in March, 1976, Congress amended the ECOA to broaden the scope of its prohibitions.

As amended, the Act prohibits a creditor from discriminating against "any applicant" on the basis of sex or marital status. 15 U.S.C. § 1691. An "applicant" is defined by the Act as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit . . ." 15 U.S.C. § 1691a. The Act specifies certain purposes for which a creditor may require the signature of an applicant's spouse on credit documents, but provides that the signature requirement may not be used as a means of discrimination. 15 U.S.C. § 1691d(a).

---

**3.** See, e. g., National Commission on Consumer Finance, Consumer Credit in the United States 152–53 (1972); Littlefield, *Sex–Based Discrimination and Credit Granting Practices,* 5 Conn.L. Rev. 575 (1973); Gates, *Credit Discrimination Against Women: Causes and Solutions,* 27 Vand.L.Rev. 409 (1974).

Regulation B greatly enlarges upon the provisions of the Act. With respect to a creditor's requirement that an applicant's spouse co–sign credit documents, the Regulation provides that such a requirement is generally impermissible:

"Except as provided in this subsection, a creditor shall not require the signature of an applicant's spouse or other person, *other than a joint applicant*, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 CFR 202.7(d)(1) (1980); (emphasis added).

It is this provision which plaintiff alleges has been violated by the defendants.

Plaintiff asserts that his oral request for credit constituted a credit "application" as that term is defined by Regulation B. The Regulation states:

"*Application* means an oral or written request for an extension of credit that *is made in accordance with procedures established* by a creditor for the type of credit requested." 12 CFR 202.2(f) (1980); (some emphasis added).

■ Of more importance, in the Court's view, is the question of whether plaintiff was an "applicant" within the meaning of the ECOA. The Act's definition of the term, quoted from above, is somewhat circular. The definition contained in the Regulation is more helpful; it defines an "applicant" as "any person who requests or who has received an extension of credit from a creditor . . ." 12 CFR 202.2(e) (1980).[4]

### III

We now proceed to a consideration of the issues presented here.

■ The first question concerns plaintiff's standing to bring this action. In this connection, the question is not whether plaintiff made an "application" by his oral request for credit. If it were, the Court would be compelled to hold for defendants without proceeding further, for it is the Court's finding that Mr. Cragin's request was not made "in accordance with procedures established" by First Federal for the type of credit he requested. The Court finds that First Federal required written applications for the sort of loan involved here; oral applications were not acceptable. Considerations of sound lending practice aside, neither the ECOA nor Regulation B requires a creditor to accept an oral application. Indeed, it is arguable that First Federal, under the regulations of the Federal Home Loan Bank Board, was prohibited from accepting an oral application for an unsecured loan of this type. See 12 CFR 545.6–12(c)(3). Therefore, the Court finds that Mr. Cragin's oral request was not a credit "application" for the purposes of the Act.[5]

■ The real determinant of plaintiff's standing is his status as an "applicant" within the meaning of the Act. The Act, by its terms, protects "applicants" from discrimination, not those who make "applications" for credit. See, e. g., 15 U.S.C. §§ 1691(a), 1691d(a), 1691e; see also *Cherry v. Amoco Oil Co.*, 481 F.Supp. 727, 732 (N.D. Ga.1979). Because plaintiff requested credit from First Federal during his telephone conversation with defendant Barnett, it is the Court's finding that he became an "applicant" on his own behalf. He thus has standing to allege a violation of the ECOA.

This brings us to the central issue in the case. Plaintiff contends that defendants engaged in conduct which violated the provisions of 12 CFR 202.7(d)(1), *supra*. That regulation, as noted, generally prohibits a creditor from demanding, as a prerequisite to the extension of credit, that an appli-

---

**4.** Thus, one may be an "applicant" within the meaning of the Regulation even though an "application" for credit is never made.

**5.** Defendant Barnett's letter of June 20 does not compel a finding that First Federal waived its requirements in this respect. In the wake of the Cragins' letter to the Home Loan Bank, Mr. Barnett was undoubtedly anxious to avoid the possibility of administrative action against First Federal. His letter is therefore viewed by the Court as a somewhat artless means to that end and nothing more.

cant's spouse co–sign the necessary documents. Here, the defendants required Mrs. Cragin to sign documents connected with the Cragins' joint application. It is plaintiff's contention that a similar requirement was imposed in connection with his oral request for credit.

■ Insofar as the joint application is concerned, the Court has concluded that defendants did not violate the ECOA or Regulation B in requiring Mrs. Cragin's signature. 12 CFR 202.7(d)(1) does not prohibit a creditor from requiring the signature of one who applies jointly with another for credit; the general prohibition of that regulation is specifically inapplicable to joint applicants. Where a joint application is made, it is not significant that the applicants are husband and wife; the creditor is still entitled to require the signatures of both of them. See E. Maltz & F. Miller, *The Equal Credit Opportunity Act and Regulation B* (1978) 31 Okla.L.Rev. 1 at page 34, footnote 162; Comment, *Equal Credit Opportunity Act Amendments of 1976* (1977) 12 Rich.L.Rev. 203, 215.

■ With respect to plaintiff's oral request for credit, the Court is again unable to find any violation of law by the defendants. No credible evidence supports plaintiff's allegation that the signature of his wife was demanded in conjunction with his request. Thus, the Court finds that no violation of 12 CFR 202.7(d)(1) has been proven.

Finally, we consider whether defendants' actions, though facially neutral with respect to plaintiff's sex and marital status, were discriminatory in their effect or involved an intent to discriminate. The question here is whether plaintiff has sustained his burden of proof. For guidance in this area, Congress has indicated that the courts are to look to certain recent decisions of the United States Supreme Court:

> "[J]udicial constructions of anti–discrimination legislation in the employment field, in cases such as *Griggs v. Duke Power Company*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971), and *Albemarle Paper Company v. Moody* [422 U.S.

405, 95 S.Ct. 2362, 45 L.Ed.2d 280], are intended to serve as guides in the application of this Act, especially with respect to the allocations of burdens of proof." 1976 U.S.Code Cong. & Admin.News, pp. 403, 406.

■ Having applied these decisions to the case at hand, the Court has concluded that plaintiff failed to make his case. Until plaintiff made out a prima facie case of discrimination, defendants were not obligated to show that their requirement of Mrs. Cragin's signature was legitimately related to the extension of credit. See *Albemarle Paper Company v. Moody, supra*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280; *Carroll v. Exxon Co., U.S.A.*, 434 F.Supp. 557, 563 (E.D.La.1977). In this situation, plaintiff might have produced evidence showing that defendants imposed the signature requirement as to some joint applications, but waived it as to others. Or plaintiff might have shown that the signature requirement, as used by defendants, resulted in the extension of credit to a class of persons significantly different from the pool of those who applied for credit. No such showing was made.

## IV

Discrimination in the extension of credit is to be condemned. There can be no doubt that such discrimination has unfairly deprived many Americans of educational, business, and other opportunities. The Court suspects, in fact, that First Federal may routinely engage in conduct which is unlawful under the ECOA and Regulation B. But such conduct was not proven here.

Therefore, judgment will be entered in favor of defendants and against plaintiff. This memorandum shall constitute the Court's findings of fact and conclusions of law herein.