**A.B. & S. AUTO SERVICE, INC. and Jerry L. Bonner, Plaintiffs,**

**v.**

**SOUTH SHORE BANK OF CHICAGO, Defendant.**

No. 95 C 5826.

United States District Court, N.D. Illinois, Eastern Division.

March 24, 1997.

---

Armand L. Andry, Law Offices of Armand L. Andry, Oak Park, IL, for Plaintiffs.

Allan E. Lapidus, Thomas G. Hancuch, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Plaintiffs AB & S Auto Service, Inc. and Jerry L. Bonner bring this action under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., against defendant South Shore Bank of Chicago. Both parties' cross-motions for summary judgment are presently before the court. For the following reasons the court denies plaintiffs' motion for summary judgment and grants defendant's motion for summary judgment.

### Background

A.B. & S. Auto Service, Inc. ("AB & S") is an automobile repair shop located in Chicago.[1] Jerry L. Bonner ("Bonner") is AB & S's president and he is an African–American. (Def.'s 12(m) Stmt. ¶¶ 3, 4.) South Shore Bank (the "bank") is a commercial bank with its main office located at 71st and Jeffery Boulevard, in Chicago's South Shore neighborhood. The bank maintains three branch offices on Chicago's South Side and a loan production office in the Austin neighborhood on Chicago's West Side. (Def.'s 12(m) Stmt. ¶¶ 1, 2.) The bank participates in the loan guarantee program sponsored by the Small Business Administration ("SBA"). (Def.'s 12(m) Stmt. ¶ 5.) The SBA requires all SBA loan applicants to complete an SBA Form 912 Statement of Personal History. The SBA Form 912 asks applicants if they have ever been charged with or arrested or convicted for any criminal offense other than a minor motor vehicle violation and asks applicants to provide details. In addition form 912 states: "The fact that you have an arrest or conviction record will not necessarily disqualify you." Before submitting a business loan guarantee request to the SBA for approval, the bank is expected to make an

---

1. Plaintiffs AB & S and Bonner and defendant South Shore Bank do not dispute the facts set forth in this section as indicated by each party's 12(m) and 12(n) Statements, unless indicated otherwise.

independent judgment concerning an applicant's criminal record in evaluating the applicant's character and other relevant factors. (Def.'s 12(m) Stmt. ¶ 5–9.)

In February 1995, AB & S applied for a $230,000 business loan from the bank after having a similar SBA loan request rejected by LaSalle Bank Lakeview. (Def.'s 12(m) Stmt. ¶ 10.) On December 27, 1994, Bonner submitted to the bank the completed SBA form 912. In response to form 912's question about arrests and convictions, Bonner listed five incidents in which he was arrested and charged, but not convicted[2]: 1) "domestic matters (husband/wife)" sometime between 1982 and 1984; 2) possession of a controlled substance in 1985; 3) disorderly conduct between 1985 and 1990; 4) possession of a controlled substance in May 1990; and 5) possession of a stolen car in September 1994. (Def.'s 12(m) Stmt. ¶ 12.) Bonner did not deny engaging in any of the conduct for which he was arrested. (Def.'s 12(m) Stmt. ¶ 13.) Bonner also listed one conviction for aggravated battery for stabbing and seriously injuring a man in 1983. (Def.'s 12(m) Stmt. ¶ 11.) He maintains that he acted in defense of himself and his wife who were assaulted by a number of assailants. (Pl.'s 12(n) Resp.Stmt. ¶ 11.)

The bank reviews applications through a loan committee process. (Pl.'s 12(n) Stmt. ¶ 3.) Ms. Leslie Davis, an African–American Vice President at the bank, reviewed the application of Bonner and recommended it for approval. (Pl.'s 12(m) Stmt. ¶ 5.) However, at the loan committee meeting, Jim Bringley and Dick Turner agreed that Bonner's loan request should be denied. David Shyrock did not get involved in the decision. (Pl.'s 12(n) Resp.Stmt. ¶ 21.)[3] Concern was expressed about Bonner's criminal record as set forth in the SBA Form 912. They found the criminal record to reflect poorly on Bonner's judgment and character. (Def.'s 12(m) Stmt. ¶ 21.) The bank decided not to make the $230,000 SBA loan to AB & S.[4] Bonner's criminal record was a motivating factor in the bank's decision not to make the loan. However, the bank does not automatically reject business loan applications made by people with criminal records. The bank's general practice in evaluating business loan applications is to consider an applicant's criminal history and the surrounding facts on a case-by-case basis and to utilize that information in evaluating the applicant's character and judgment which, in turn, is used in assessing the ability and willingness of the applicant to repay the loan. (Def.'s 12(m) Stmt. ¶ 22–25.)

During the last 15 years, the bank has considered thousands of business loan applications. There is no evidence that the bank has denied any loan requests because of an applicant's criminal history other than AB & S's $230,000 loan request. (Def.'s 12(m) Stmt. ¶¶ 26, 27.) The bank does not keep records of rejected business loan applicants; specifically, the bank does not keep records of applicants who were rejected on the basis of a criminal record. (Pl.'s 12(n) Stmt. ¶ 11.) The bank does not keep records that indicate the race of a rejected loan applicant. (Def.'s 12(m) Stmt. ¶ 27; Pl.'s 12(n) Resp.Stmt. ¶ 27.) The bank has made at least three business loans to applicants with criminal records. One of the these three applicants was African–American. (Def.'s 12(m) Stmt. ¶¶ 28, 29.)

Dr. Jaslin U. Salmon testified as an expert witness for plaintiffs in this case. He is a professor at Triton College and has researched and reviewed various statistics in

---

2. In plaintiff's 12(n) Resp. Statement ¶¶ 15–20, plaintiff maintains that the information about these arrests and charges did not come to the attention of the loan committee; however, they were listed on the Form 912. He does admit to the truth of the allegations. Specifically, regarding the charges for possession of a controlled substance, domestic abuse, and disorderly conduct, plaintiff admits that these incidents involved an exercise of bad judgment and reflected negatively on his character. (Def.'s 12(m) Stmt. ¶¶ 15, 16, 18, 19.)

3. In plaintiff's 12(n) Statement, plaintiff specifically admits the allegations of paragraph 21 of defendant's 12(m) Statement, but maintains that they are incomplete. (Pl.'s 12(n) Stmt. ¶ 21.)

4. The bank makes non-SBA loans as well as SBA guaranteed loans and although SBA loans require filing of the criminal record form 912, non-SBA loans do not require such a filing. (Pl.'s 12(n) Stmt. ¶ 7.)

order to give an opinion in this case. He opines that any kind of decision that is based on arrest records would militate against people of color. He indicated that some studies have suggested that although a higher percentage of blacks are arrested for and convicted of crimes, those figures do not necessarily reflect that a higher percentage of blacks actually commit crimes. (Pl.'s 12(m) Stmt. ¶¶ 13–14, 16.) He suggests that, based on his research, that there are many cases in which the black applicant is qualified, credit worthy, but was not given the loan for other reasons and among those reasons, arrest records had been taken into consideration. (Pl.'s 12(m) Stmt. ¶¶ 14, 15.) However, the bank disputes this point because Dr. Salmon was unable to identify a single study showing that consideration of arrest records has a disproportionate impact on African–American applicants for any type of credit, much less any study addressing the impact on business loan applicants. (Def.'s 12(n) Stmt. ¶ 15.)

Plaintiffs initiated this action under both 42 U.S.C. § 1981 and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 et seq. Plaintiffs allege that the bank's practice of considering an applicant's criminal record in making business loan decisions has an unlawful disparate impact on African–American men. (Compl.¶¶ 15–16, 22–23.) On December 13, 1995, plaintiffs voluntarily dismissed the § 1981 claim, leaving only the ECOA claim. Now pursuant to Fed.R.Civ.P. 56(c), defendant moves this court for summary judgment because plaintiffs cannot establish a prima facie under the ECOA. According to defendant, even if plaintiff could establish the prima facie case, the bank is still entitled to summary judgment because consideration of an applicant's criminal record in evaluating SBA loan requests is justified as relevant to creditworthiness and the bank's obligation to do so as an SBA-approved lender. (Def.'s Mem.Supp.Sum.J. at 4–5.) Plaintiffs also move this court for summary judgment on the grounds that considering an applicant's criminal record, without relating it to creditworthiness, discriminates against blacks and is unjustified. (Pl.'s Mem. Supp.Summ.J. at 8.)

## Motion for Summary Judgment

Both plaintiffs Bonner and AB & S and defendant South Shore Bank move this court to enter summary judgment on their behalf under Rule 56 of the Federal Rules of Civil Procedure. The court will render summary judgment only if the factual record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 173 (7th Cir.1996) (quoting Fed. R.Civ.P. 56(c)). The court will not render summary judgment if "a reasonable jury could return a verdict for the nonmoving party." *Sullivan v. Cox,* 78 F.3d 322, 325 (7th Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). In ruling on a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving party. *Bratton,* 77 F.3d at 171 (citation omitted); *Sullivan,* 78 F.3d at 325 (citation omitted).

On a motion for summary judgment, the moving party "bears the initial burden of showing that no genuine issue of material fact exists." *Hudson Ins. Co. v. City of Chicago Heights,* 48 F.3d 234, 237 (7th Cir. 1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Then the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 234 (7th Cir.) (citations omitted), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995).

Where cross-motions for summary judgment have been submitted, the court is not required to grant judgment as a matter of law for one side or the other. *International Underwriting Services, Inc., v. The Prudential Insurance Company of America,* No. 95 C 5633, 1997 WL 75646, *4 (N.D.Ill. Feb.18, 1997) (citing *Heublein, Inc. v. U.S.,* 996 F.2d 1455, 1461 (2d Cir.1993)). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the par-

ty whose motion is under consideration. *Id.* (citation omitted); *See also Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993).

## Analysis

■ The court must determine whether South Shore Bank's policy of inquiring about a credit applicant's criminal record, in compliance with the SBA's requirements, violates the ECOA. The ECOA provides, in relevant part, that:

> it shall be unlawful for any creditor to discriminate against an applicant, with respect to any aspect of a credit transaction—
>
> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)

15 U.S.C. § 1691(a)(1). A credit applicant can prove discrimination under the ECOA by using any one of the following three different approaches used in the employment discrimination context: 1) direct evidence of discrimination;[5] 2) disparate impact analysis, also called the "effects" test; or 3) disparate treatment analysis.[6] *See Saldana v. Citibank, Federal Savings Bank,* No. 93 C 4164, 1996 WL 332451 *2 (N.D.Ill. June 13, 1996) (Applicant has three options to prove her discrimination case: direct evidence, disparate treatment theory, or disproportionate impact analysis.); *See* Charlotte E. Thomas, *Defending a Free Standing Equal Credit Opportunity Act Claim,* 114 Banking Law Journal, 108, 109 (1997) (same).

■ In order to prove discrimination under the disparate impact analysis or "effects" test,[7] an applicant must show how "a policy, procedure, or practice specifically identified by the [applicant] has a significantly greater discriminatory impact on members of a protected class." *Saldana,* No. 93 C 4164, 1996 WL 332451, at *4 (citing *Simms v. First Gibraltar Bank, et al.,* 83 F.3d 1546, 1555

---

5. To prove discrimination in violation of the ECOA with direct evidence, an applicant must offer direct evidence that the decision to deny credit was based on an impermissible factor. *See Saldana v. Citibank, Federal Savings Bank,* No. 93 C 4164, 1996 WL 332451 *2 (N.D.Ill. June 13, 1996); *See* Charlotte E. Thomas, *Defending a Free Standing Equal Credit Opportunity Act Claim,* 114 Banking Law Journal 108, 109 (1997) (" 'Direct evidence' of discrimination may be established through explicit and unambiguous statements of hostility toward persons protected by ECOA, which prove discrimination without inference or presumption.")

6. To prove discrimination in violation of the ECOA using the disparate treatment approach in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), an applicant must first make out a prima facie case by showing: "1) that he is a member of a protected class; 2) that he applied for and was qualified for a loan from the defendant; 3) that the loan was rejected despite his qualifications; and 4) that the defendant continued to approve loans for applicants with qualifications similar to the plaintiffs." *Milton v. Bancplus Mortgage Corp.,* No. 96 C 106, 1996 WL 197532 *2 (N.D.Ill. April 19, 1996) (citations omitted). Once the plaintiff makes the prima facie case, the burden "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the action it did against plaintiff." *Sayers v. General Motors Acceptance Corp.,* 522 F.Supp. 835, 840 (W.D.Mo. 1981); *See* Thomas, *Defending an ECOA Claim,* at 112 (same). Finally, if the lender comes for-

ward with a legitimate, non-discriminatory reason for denying the applicant credit, the applicant then must show that these reasons are just a pretext for discrimination. *See Saldana,* No. 93 C 4164, 1996 WL 332451 *3 (Applicant may still prevail if she can prove by a preponderance of the evidence that a discriminatory reason more likely motivated the bank or that the bank's proffered explanation is unworthy of credence or is a pretext for discrimination.)

7. In June 1995, the Board of Governors of the Federal Reserve System ("FRB") promulgated its final version of its amendments to Regulation B which implements the ECOA. 60 Fed.Reg. 29965 (June 7, 1995). These amendments covered a variety of issues; however, most importantly it touched on the disparate impact approach. Specifically, section 202.6(a) provides:

> Except as otherwise provided in the act and this regulation, a creditor may consider any information obtained, so long as the information is not used to discriminate against an applicant on a prohibited basis.[FN2]
> [FN2] The legislative history of the act indicates that the Congress intended an "effects test" concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs v. Duke Power Co.* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), to be applicable to a creditor's determination of creditworthiness.

12 C.F.R. § 202.6(a) (West 1997).

(5th Cir.), cert. denied sub nom, *Simms v. First Madison Bank, FSB,* — U.S. —, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996)); *See also Sayers,* 522 F.Supp. at 839 (To make out the prima facie case, plaintiff must show that the defendant's requirements for accepting credit applications result in the acceptance of credit applicants in a pattern significantly different from that of the general pool of applicants.) Plaintiffs traditionally establish this prima facie case by making "a statistical comparison of the representation of the protected class in the applicant pool with representation in the group actually accepted from the pool." *Id.* "If the statistical disparity is significant, then plaintiff is deemed to have made out a prima facie case." *Cherry,* 490 F.Supp. at 1030. However, courts have found that "proof of disparate impact need not be shown by statistics in every case nor need it be shown by proof of actual disproportionate exclusion from the applicant pool." *Id.* at 1031. The *Cherry* court commented that some Title VII cases have permitted reference to the general population on the assumption that the applicant pool would possess approximately the same characteristics. But this assumption is not valid in every case. Plaintiff must demonstrate why the use of general population statistics would be valid. *Cherry,* 490 F.Supp. at 1031 n. 9.

■ Once the plaintiff has made the prima facie case, the defendant-lender must demonstrate that any policy, procedure, or practice has a manifest relationship to the creditworthiness of the applicant. *See Sayers,* 522 F.Supp. at 839 ("manifest relationship to creditworthiness"); *Carroll v. Exxon Company, U.S.A.,* 434 F.Supp. 557, 563 (E.D.La. 1977) (same); *Cragin v. First Federal Sav. and Loan Ass'n,* 498 F.Supp. 379, 384 (D.Nev.1980) (because the plaintiffs failed to make out the prima facie case, the defendants were not obligated to show that the practice was "legitimately related to the extension of credit".) In other words, the onus is on the defendant to show that the particular practice makes defendant's credit evaluation system more predictive than it would be otherwise. *Cherry,* 490 F.Supp. at 1031.

## I. Prima Facie Case

Courts have held that the use of general population statistics is insufficient to make out a prima facie case under the ECOA. In *Saldana,* the plaintiff, loan-applicant, sued Citibank claiming it denied her loan based on its policy of redlining. *Saldana,* No. 93 C 4164, 1996 WL 332451 at *1. Saldana tried to make her case under the disparate impact theory. *Id.* at *4. Specifically, she claimed that Citibank had an unwritten policy that set the minimum amount for a rehab loan at $100,000. This policy, she claims, disproportionately impacted the African–American community because few African–Americans could meet this financial test based on their income and net-worth. *Id.* Saldana offered statistical evidence regarding 1) the bank's loan approval rate for loans over $100,000 in the Austin area; 2) the bank's loan rejection rate for white and African–American applicants in comparison with their representation in the greater Chicago community; and 3) the bank's average refinancing approval and average rejection rate in Austin in comparison to the City of Chicago's average approval and rejection rates. *Id.* at *4–5. While the court found that this last set of statistics successfully presented some statistical evidence comparing the Austin community to the greater Chicago community, the court still found that "these statistics are of a very general nature and do not relate specifically to the policy identified as having a discriminatory impact. Thus, Saldana has failed to establish her claim under a disparate impact analysis." *Id.* at *5.

Similarly, in *Cherry,* the credit-card applicant sued Amoco Oil Company, alleging that Amoco's use of zip code ratings in Atlanta, which assigned low-ratings to those zip code areas where Amoco had unfavorable delinquency experience, adversely effected black applicants disproportionately. *Cherry,* 490 F.Supp. at 1027–28. The plaintiff's witness testified that he compiled statistics that proved that there is a significant correlation between acceptance rate/percentage of white population or conversely rejection rate/percentage of non-white population. *Id.* at 1028. Following the guidance of *Griggs,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the

court held that this statistical evidence did not make out a prima facie case.[8]  *Id.* at 1030.  Specifically, plaintiff did not demonstrate why the court should assume that the applicant pool possessed approximately the same characteristics as the general population surveyed.  *Id.* at 1031 n. 9.

In the Title VII context, courts have also held that the use of general population statistics is insufficient to make out a prima facie case under Title VII. *See Matthews v. Runyon,* 860 F.Supp. 1347 (E.D.Wis.1994); *Hill v. U.S. Postal Service,* 522 F.Supp. 1283 (S.D.N.Y.1981).[9]  In *Matthews,* the applicant claimed that the U.S. Postal Service's ("USPS") practice of considering an applicant's criminal charges adversely impacts blacks. *Matthews,* 860 F.Supp. at 1356.  The applicant offered general statistical evidence of higher arrest rates among blacks than whites in the Milwaukee area to prove that the USPS' practice has a disproportionate impact on employment opportunities for blacks.  *Id.* at 1357.  The court held that this evidence, standing alone, fails to provide the requisite causal link between the challenged employment practice and the disparate impact. *Id.*

Similarly, in *Hill,* the applicants claimed that the USPS' policy regarding employment of individuals with criminal records has a significant and disproportionate impact on minority group members. *Hill,* 522 F.Supp. at 1288.  They submitted statistical evidence of the proportion of minorities in the general population and the proportion of minority arrests and convictions in the general population for a number of different time periods and geographic areas.  *Id.* at 1294.  The court found this evidence to be problematic because it assumes that all convicted felons apply to the postal service, pass the necessary competitive examination, and then are rejected because of their criminal record.  But there is no evidence in the record that discloses the proportion of convicted persons, either black or white, that could successfully complete the postal service exam.  *Id.* at 1302.  The court also indicated that this evidence was undermined by the fact that the defendant's policy was not consistently applied to disqualify applicants with criminal records.  The court held that the statistical evidence is not sufficient to establish a prima facie case that defendant's policy had a disparate impact upon minorities.  *Id.* at 1303.

■ Plaintiffs claim that South Shore Bank's practice of considering an applicant's criminal record in making commercial lending decisions has a disparate impact on African–Americans.  To make the prima facie case plaintiffs offer the testimony of Dr. Jaslin U. Salmon.  Dr. Salmon testified that any decision that is based on arrest records would militate against people of color.  He suggests that, based on his research, there are many cases in which the black applicant is qualified, credit worthy, but was not given the loan for other reasons and among those reasons, arrest records had been taken into consideration.  (Pl.'s 12(m) Stmt. ¶¶ 14, 15.)  However, the bank disputes this point because Dr. Salmon was unable to identify a single study showing that consideration of arrest records has a disproportionate impact on African–American applicants for any type of credit, much less any study addressing the impact on business loan applicants.  (Def.'s

---

8.  The *Cherry* court assumed that the plaintiff did not make a statistical comparison based on the actual applicant pool because of the specific prescription in the ECOA against creditors inquiring into the race, sex, or marital status of an applicant.  *Cherry,* 490 F.Supp. at 1030.

9.  *See also Equal Employment Opportunity Commission v. Carolina Freight Carriers Corp.,* 723 F.Supp. 734, 750–51 (S.D.Fla.1989) (The court found that, based on general population statistics, Hispanics are convicted at substantially higher rates than non-Hispanics and that an employment practice which disqualifies applicants because of a conviction impacts Hispanics at a statistically significant rate exceeding that of non-Hispanics.  However, the court still found that these statistics were insufficient to make out a prima facie case because they did not examine applicant flow data and there was no evidence that any specific number of Hispanic drivers were disqualified for employment.  Additionally, the study did not attempt to show that any significant number of drivers were deterred from applying for work because of the defendant's conviction policy; nor did the study prove what percentage of Hispanics with convictions would be otherwise qualified for employment.)

12(n) Stmt. ¶ 15.) [10]

In addition to Dr. Salmon's testimony, plaintiffs offer the general population statistics of arrest rates by race in 1990. (*See* Pl.'s Ex. 7.) Considering these general population statistics, the court finds that, like both the *Matthews, Hill, Cherry,* and *Saldana* courts found, these statistics are insufficient to make out a prima facie case under the ECOA. The court recognizes that the ECOA prohibits creditors from inquiring into the race, sex or marital status of an applicant. This in turn places plaintiffs in a difficult position of trying to prove disproportionate impact without any access to a creditor's statistical lending profile. However, as the *Cherry* court held, plaintiffs can refer to the general population as long as plaintiffs clearly demonstrate that the applicant pool would posses approximately the same characteristics. Considering the statistical proof and the testimony of Dr. Salmon, the court finds that plaintiffs have not made this showing that the applicant pool possesses approximately the same characteristics as the general population.

Both the statistics and Dr. Salmon's supporting testimony do not answer the following questions raised in *Carolina Freight Carriers Corp.* and *Hill:* 1) how many African–Americans with convictions or arrests are otherwise qualified for the loan; and 2) how many African–Americans are deterred from applying because of the bank's practice.

Plaintiffs' evidence is further undermined, as it was in *Hill,* by the fact that the bank's practice of considering an applicant's criminal record was not consistently applied to disqualify applicants with criminal records. (Def.'s 12(m) Stmt. ¶ 24.) Rather, the bank has made at least three business loans to applicants with criminal records. One of these three applicants with criminal records is African–American. (Def.'s 12(m) Stmt. ¶¶ 28, 29.)

Plaintiffs urge this court to consider several EEOC decisions,[11] specifically EEOC decision 6357, which cites to *Gregory v. Litton Systems, Inc.,* 316 F.Supp. 401, 403 (C.D.Cal. 1970), *modified by,* 472 F.2d 631 (1972). The court recognizes that the *Gregory* court held that the policy of automatically rejecting an applicant because of his significant arrest record is illegal because it has been shown to eliminate black applicants at a higher rate than white applicants and it is usually irrelevant as a predictor of job performance. *See Smith v. American Service Company of Atlanta, Inc.,* 611 F.Supp. 321, 326–27 (N.D.Ga. 1984), *aff'd in part and vacated in part,* 796 F.2d 1430 (11th Cir.1986) (citing *Gregory,* 316 F.Supp. 401); *Hill,* 522 F.Supp. at 1301 (same). However, the facts of this case, as in both *Smith* and *Hill,* are distinct from the facts in *Gregory* because South Shore Bank does not have a blanket policy of excluding applicants with criminal records. Therefore,

---

**10.** Specifically, Dr. Salmon was asked the following questions:

Q: Assuming putting aside the question of arrest or convictions, just taking the fact that the black applicant is qualified to begin with, that is but for the arrest or conviction, the black would be eligible for credit or a loan, are you aware of any statistics regarding the impact of arrest or convictions on that black applicant who is otherwise qualified for a loan and is otherwise credit worthy?

A: Yes, I am telling you that what I know is that there are many cases in which the black applicant is qualified, credit worthy, but was not given the loans for other reasons and among those reasons, things like arrests and things like their job situation have been taken into consideration.

Q: Have you used those statistics in forming any of your opinions?

A: Yes, because based on what I know of the way blacks have been treated and based on my own understanding of how the institutions work, yes, I recognize that blacks and other minorities have been disproportionately affected.

Q: Where would I go to find these statistics you say that is where blacks are otherwise qualified for loans or credit worthy, if I wanted to see them myself?

A: Again, I am telling you that I cannot offhand at this point tell you what those sources are, but some of it may have been from newspapers, some it [sic] of it from magazines, and I can't reference those very particularly right now, but I can certainly find those for you at a later date.

(Salmon Dep. at 46–47.)

**11.** EEOC decisions are merely persuasive; they are not controlling authority. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 799, 93 S.Ct. 1817, 1822–23, 36 L.Ed.2d 668 (1973).

**1064**

the holding of *Gregory* does not apply to this case.

## II. Manifest Relationship to Creditworthiness

■ Generally when the plaintiff has failed to make out a prima facie case, courts do not require the defendant-lender to show that the practice has a manifest relationship to creditworthiness. *Cragin,* 498 F.Supp. at 384; *Carroll,* 434 F.Supp. at 563. In the present case, assuming, arguendo, that plaintiff did set forth enough evidence to make out the prima facie case, the court must then determine whether South Shore Bank has demonstrated that its practice of considering an applicant's criminal record is legitimately related to the extension of credit.

South Shore Bank's practice of inquiring into a credit applicant's criminal history is legitimately related to its extension of credit for two reasons. First, the regulations require the SBA, in evaluating a loan guarantee application, to consider "the character, reputation, and credit history of the applicant, its associates, and guarantors." 13 C.F.R. § 120.150. As a participant in the SBA loan guarantee program, South Shore Bank is obligated to consider an applicant's criminal record provided on SBA Form 912 in its evaluation of a loan applicant's character. Following the guidance of *Cragin,* the court finds that, because the bank's practice of considering criminal record information is required by the SBA to participate in the SBA loan guarantee program, the practice is legitimately related to the extension of credit and, therefore, permissible.

Secondly, the bank's inquiry into an applicant's criminal record provides relevant information about an applicant's creditworthiness, particularly his judgment and character. Plaintiff Bonner admits that several of the incidents described in his completed SBA Form 912: possession of a controlled substance, domestic abuse, and disorderly conduct, reflected negatively on his judgment and character. Specifically, Bonner admits that these incidents involved an exercise of bad judgment. Therefore, because an applicant's judgment and character may legitimately be considered in making commercial lending decisions, South Shore Bank's practice of considering criminal history as it relates to character and judgment bears a legitimate and manifest relationship to the extension of credit. Therefore, the court finds that the bank has successfully demonstrated that its practice of inquiring into a credit applicant's criminal record is legitimately related to the extension of credit.

Plaintiffs have failed to make out a prima facie case of discrimination in violation of the ECOA under the disparate impact theory. Despite the fact that plaintiffs have not made their prima facie case, defendant, on the other hand, has demonstrated that its practice has a manifest relationship to the extension of credit.

### *Conclusion*

For the foregoing reasons, the court grants defendant South Shore Bank's motion for summary judgment and denies plaintiff Bonner and AB & S's motion for summary judgment.